[Crim. No. 2227. Fifth Dist. May 13, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY ALAN BENNETT, Defendant and Appellant.

**COUNSEL**

W. Stuart Home, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Gregory W. Baugher and Robert F. Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FRANSON, J.**—Appellant was indicted on September 3, 1974, for the murder of his wife, Mary Jo, on or about October 18, 1972. He was arraigned and pleaded not guilty. Jury trial commenced November 10, 1974, and on December 12, 1974, the jury found appellant guilty of murder in the first degree. He was denied probation and sentenced to the term prescribed by law.

Because we have concluded that appellant's conviction must be reversed due to the prosecution's failure to prove that appellant knowingly and intelligently waived his *Miranda* rights before he was interviewed by Dr. Lunde, we need only briefly summarize the facts.

Appellant and Mary Jo were married in 1968. In March 1970, they moved to McKinleyville, California, so that appellant could attend Humboldt State College. In October 1970, their daughter, Rachel, was born. Thereafter, marital troubles began, and appellant and Mary Jo constantly argued about Rachel. Appellant said he would give Mary Jo a divorce if he received custody of Rachel.

In July 1972, Mary Jo, with Rachel, left appellant. They lived several weeks with her parents in Alameda. In October 1972, they moved to Merced to live with Mary Jo's brother, Larry, and his wife, Carmella. On October 18, 1972, sometime after 1:30 p.m., Mary Jo disappeared. She has not been seen or heard from since. Substantial circumstantial evidence was introduced tending to show that appellant killed Mary Jo and that his motive was to obtain custody of Rachel.

On October 22, 1972, three days after Mary Jo's disappearance, appellant was interviewed by Detective Sergeant Garibay and Officer Heitman of the Merced Police Department. Appellant waived his *Miranda* rights and agreed to talk with the officers. Appellant denied he had seen Mary Jo on the 18th. He appeared to be concerned about her disappearance and offered to cooperate with the officers. When Sergeant Garibay asked appellant his whereabouts on the afternoon of October 18, appellant stated he could not recall or account for two hours—from 1:30 to about 3:30 p.m. Appellant also consented to a search of his van. The search revealed a blood spot about the size of a pencil eraser, a smear of blood on the rear door, several strands of hair, leather gloves and two knives. The blood smear had matted hair on it. During the search of the van, appellant appeared to be very nervous and asked,

"Could I have killed Mary Jo?" Officer Garibay said, "Yes, you could have killed Mary Jo."

On November 8, 1972, Officers Garibay and Heitman interviewed appellant at his boarding house in Oakland. They testified that after receiving his consent to search his room they found some letters addressed to a girlfriend named "Penney." Appellant, however, denied he had consented to a search of his premises.

Appellant was interviewed by Dr. Lunde, a psychiatrist at Stanford Medical School. The interviews took place at Dr. Lunde's offices at Palo Alto on December 5, 7, 18 and 21, 1972. Appellant was taken to each interview by the Merced police officers, and each interview lasted for approximately one and one-half hours. While the record is silent as to the circumstances giving rise to the interviews,[1] Dr. Lunde testified that the original purpose of interviewing appellant was "to clear up an approximately two hour period of amnesia which Mr. Bennett said he had for the afternoon of October 18, 1972."

At trial, Dr. Lunde was called as a prosecution witness to express an opinion that appellant had a dual motive for killing Mary Jo—his concern for the raising of Rachel and his desire to obtain her custody. In the course of explaining the reasons for his opinion, Dr. Lunde testified to several incriminating statements by appellant during the interviews. For example, after repeated questioning by Dr. Lunde, appellant acknowledged that perhaps he had not suffered amnesia and suggested a conspiracy against him by Mary Jo's family. He said that he hated Mary Jo; that she shouldn't live; that she was a bad housekeeper, a slut and an immoral woman. He further told Dr. Lunde that such "a terrible person ought not to live" and "ought not to be allowed to raise his child." He expressed his feeling that Mary Jo and Rachel would be better off if Mary Jo were dead. Appellant also related to Dr. Lunde certain statements made to him by Mary Jo, such as, "If you kill me you won't get custody." Appellant also told Dr. Lunde about two dreams he had

---

[1]Respondent argues that appellant agreed to be interviewed by Dr. Lunde in an attempt to throw suspicion away from himself. The only evidence which possibly supports such an inference is appellant's cooperation on October 22 in answering police questions about Mary Jo's disappearance and consenting to a search of his van, and the officers' testimony that appellant consented to a search of his house in Oakland on November 8. The record is silent insofar as any testimony by appellant or the officers as to who requested the interviews with Dr. Lunde, the reason for the interviews, and whether appellant was coerced into agreeing to the interviews under threat of prosecution for Mary Jo's murder if he did not consent thereto.

had approximately two weeks before Mary Jo's disappearance. In the first dream he saw Mary Jo dead in a coffin. In the second dream he saw Rachel in a coffin, but he was able to lift her out of the coffin and declare that she was not dead. Dr. Lunde testified that most dreams represent "wish fulfillment." He expressed the opinion that appellant's dreams represented his wish that Mary Jo were dead and that he had to rescue Rachel from the evil influence of her mother.

Appellant timely objected to Dr. Lunde's testimony on several grounds, one of which was "that Dr. Lunde was at the time [of the interviews] employed by the prosecution . . . , and that his interview with the defendant was not prefaced by the necessary admonitions under *Miranda.*" In response, the prosecutor stated that appellant had been advised of his *Miranda* rights. Later, in further argument out of the presence of the jury, the prosecutor told the court: "This is a case where the court did not appoint the doctor, but where the defendant was advised of his constitutional rights by the doctor [and] after being fully advised agreed to talk with the doctor on four separate occasions." Without any further inquiry or hearing, the trial judge overruled appellant's objections.

During Dr. Lunde's testimony before the jury, the prosecution asked the following question:

"Q. And did you advise Mr. Bennett of his Constitutional rights before proceeding on your first interview? A. Yes, I did. We went over in some detail at the beginning of the first interview."

Later, in Dr. Lunde's testimony, the following took place: "Q. You saw him on four occasions, . . . ? A. Yes. Q. And in the first of these occasions you told him you were working for the district attorney's office? A. Yes. Q. You said you were going to report—what you learned from him might be or could very well be reported to the authorities, did you not? A. Yes, I certainly did."

## DISCUSSION

At the outset we observe that the trial court failed to properly adjudicate the admissibility of Dr. Lunde's testimony concerning appellant's incriminating statements. The timely *Miranda* objection imposed on the trial court a procedural duty to determine the existence or nonexistence of the preliminary fact, i.e., appellant's waiver of his

*Miranda* rights, out of the presence of the jury. (Evid. Code, §§ 310, 402, 405; *People* v. *Rowe* (1972) 22 Cal.App.3d 1023, 1030 [99 Cal.Rptr. 816].) That a defendant is entitled to a voir dire hearing on the *Miranda* question before his extrajudicial statements are admitted into evidence is beyond question. (See *People* v. *Eli* (1967) 66 Cal.2d 63, 76 [56 Cal.Rptr. 916, 424 P.2d 356]; *People* v. *Green* (1965) 63 Cal.2d 561, 565 [47 Cal.Rptr. 477, 407 P.2d 653]; *People* v. *Schader* (1965) 62 Cal.2d 716, 728 [44 Cal.Rptr. 193, 401 P.2d 665]; Witkin, Cal. Evidence (2d ed. 1974 Supp.) § 492, pp. 410-411.) And while the trial court need ·not make formal findings, its determination on the *Miranda* question must be reflected in the record with "unmistakable clarity." (*Sims* v. *Georgia* (1967) 385 U.S. 538, 544 [17 L.Ed.2d 593, 598, 87 S.Ct. 639, 643]; *People* v. *Rowe, supra.* 22 Cal.App.3d at p. 1029.)[2]

Instead of adjudicating the *Miranda* question as required by Evidence Code section 405, the trial court apparently accepted the prosecutor's bald assertion that appellant had been advised of his constitutional rights by Dr. Lunde and overruled the objection.

Regardless of the trial court's procedural error, however, appellant has suffered no prejudice if the prosecution proved through the testimony of Dr. Lunde or other witnesses that appellant's statements at the interviews were in fact preceded by an adequate waiver of his *Miranda* rights. Thus, as a reviewing court, we must independently examine the record to determine if the *Miranda* requirements were satisfied.

*Miranda* v. *Arizona, supra,* 384 U.S. 436 holds that before a defendant's out-of-court statements, exculpatory or inculpatory, resulting from custodial interrogation[3] can be received against him, the prosecution

---

[2]Evidence Code section 405 required the trial court to indicate which party had the burden of proof on the preliminary fact. This was of critical importance because of the rule that a *Miranda* waiver cannot be inferred from circumstantial evidence such as the fact that a defendant makes a statement to the police. (See *Miranda* v. *Arizona* (1966) 384 U.S. 436, 475 [16 L.Ed.2d 694, 724, 86 S.Ct. 1602, 1628, 10 A.L.R.3d 974]; *People* v. *Stewart* (1965) 62 Cal.2d 571, 580 [43 Cal.Rptr. 201, 400 P.2d 97]; *People* v. *Lilliock* (1965) 62 Cal.2d 618, 622 [43 Cal.Rptr. 699, 401 P.2d 4].) If the trial court had advised the prosecution of its burden of proof on the *Miranda* issue, the officers and perhaps the appellant would have presented testimony to the court and the "silent record" problem hereafter discussed would have been avoided.

[3]Respondent concedes that Dr. Lunde was acting in the capacity of a police agent and that the interviews were conducted in an atmosphere of a custodial interrogation. (See *People* v. *Polk* (1965) 63 Cal.2d 443, 449 [47 Cal.Rptr. 1, 406 P.2d 641]; *People* v. *Walker* (1972) 29 Cal.App.3d 448, 453 [105 Cal.Rptr. 672]; *People* v. *Montgomery* (1965) 235 Cal.App.2d 582, 589-590 [45 Cal.Rptr. 475]; see also Witkin, Cal. Criminal Procedure (1975 Supp.) § 361G, pp. 424-425.)

must prove that the defendant was informed in clear and unequivocal terms of (1) his right to remain silent; (2) that anything he says can and will be used against him in court; and (3) his right to the presence of counsel, which means the right to consult an attorney and to have his attorney with him during the interrogation so as to protect his privilege against self-incrimination. (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 467-471 [16 L.Ed.2d at pp. 719-722, 86 S.Ct. at pp. 1624-1626]; Witkin, Cal. Criminal Procedure (1975 Supp.) § 361E-1, pp. 408-413.)

Particularly applicable to the present case is the following: "Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. *No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead.* Only through such a warning is there ascertainable assurance that the accused was aware of this right." (384 U.S. at pp. 471-472 [16 L.Ed.2d at p. 722, 86 S.Ct. at p. 1626]. Italics added.) Moreover, if interrogation continues without an attorney, " . . . a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." (384 U.S. at p. 475 [16 L.Ed.2d at p. 724, 86 S.Ct. at p. 1628].) And, ". . . a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a [statement] was in fact eventually obtained." (384 U.S. at p. 475 [16 L.Ed.2d at p. 724, 86 S.Ct. at p. 1628].)

This synopsis of *Miranda* demonstrates beyond question that the prosecution failed to meet its burden of proving Dr. Lunde properly advised appellant of his constitutional rights and that appellant knowingly and intelligently waived his rights. As far as the record shows, Dr. Lunde failed to advise appellant of his right to remain silent and his right to an attorney during the interviews; furthermore, no express waiver of any *Miranda* right is shown.

The question arises whether appellant's waiver of his *Miranda* rights on October 22, 1972, some six weeks before his interviews with Dr. Lunde, can be carried over to insulate his statements to Dr. Lunde from

constitutional attack. ■ It is clear that subsequent statements by a defendant without *Miranda* warnings are nonetheless admissible upon a judicial finding that a prior adequate warning was given "within a reasonably contemporaneous period of time." (*People* v. *Johnson* (1973) 32 Cal.App.3d 988, 997 [109 Cal.Rptr. 118]; *People* v. *Bynum* (1971) 4 Cal.3d 589, 600 [94 Cal.Rptr. 241, 483 P.2d 1193]; *People* v. *Johnson* (1969) 70 Cal.2d 469, 477 [74 Cal.Rptr. 889, 450 P.2d 265]; *People* v. *Brockman* (1969) 2 Cal.App.3d 1002, 1006 [83 Cal.Rptr. 70].)

Whether the prior *Miranda* warning is adequate depends upon the particular facts and circumstances of the case including the background, experience and conduct of the accused. (See *People* v. *Duren* (1973) 9 Cal.3d 218, 238 [107 Cal.Rptr. 157, 507 P.2d 1365]; *People* v. *Brockman, supra,* 2 Cal.App.3d at p. 1008.) While the phrase "reasonably contemporaneous" is incapable of precise definition, "contemporaneous" means "at or near the same time" and is synonymous with "simultaneous" and "concurrent." (See Webster's New Internat. Dict. (3d ed.) p. 491.) Two cases illustrate the limited scope of the exception to the general rule that a contemporaneous warning is required under *Miranda* at the outset of each interrogation. In *People* v. *Bynum, supra,* 4 Cal.3d 589, 596, the defendant was arrested in his home for the murder of the victim, and he was immediately advised of and waived his constitutional rights. The police then took the defendant to the police station and, some 30 to 40 minutes later, took his statement. The statement was deemed to be the same interrogation contemplated by the officers and understood by the defendant when he waived his rights. "It was reasonably within the time served by the warning." (4 Cal.3d at p. 600.) In *People* v. *Meneley* (1972) 29 Cal.App.3d 41, 58 [105 Cal.Rptr. 432], the time lag between the advisement and subsequent interview was 15 minutes. Under these cases, the December interviews with Dr. Lunde cannot, under any stretch of the imagination, be deemed to have been "reasonably contemporaneous" with the October 22 interrogation. The October 22 waiver was obviously intended by the police and understood by appellant to cover the police interrogations on that day and not the interviews with Dr. Lunde six weeks later.

■ Respondent argues somewhat vaguely that, because appellant was a college graduate, and because he had been advised of his *Miranda* rights on October 22 and professed to cooperate with the police by waiving his rights and talking with them on October 22 and, later, on November 8th, Dr. Lunde's "reminder" of his constitutional rights on December 5 is sufficient evidence from which an inference can be drawn

that appellant fully understood his rights and knowingly, intelligently and voluntarily waived them at the time he talked with Dr. Lunde. The argument is without merit for several reasons: First, it is based on inferences from circumstantial evidence that tend to show only that appellant *may* have been aware of his rights when he talked with Dr. Lunde. As previously noted, such evidence cannot support a finding of waiver. (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 471 [16 L.Ed.2d at pp. 721-722, 86 S.Ct. at p. 1626]; Witkin, Cal. Criminal Procedure (1975 Supp.) § 361E-1, p. 410.) The prosecution was required to prove that appellant was *in fact* aware of his rights and *in fact* knowingly, intelligently and voluntarily waived them before talking with Dr. Lunde. Second, where the trial court has not adjudicated the inferences, as a reviewing court we can look only to the undisputed facts to determine if there was a valid waiver. (*People* v. *Randall* (1970) 1 Cal.3d 948, 954 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *Johnson, supra,* 70 Cal.2d 469, 476.) Because the trial court did not decide whether the October 22 waiver carried over to the December interviews, and because the record is silent as to what transpired between appellant and the officers after October 22 concerning his claimed amnesia and the circumstances leading to the interviews with Dr. Lunde, we cannot ascertain whether appellant truly agreed voluntarily to talk with Dr. Lunde, or whether he was coerced into talking with him under threat of prosecution for Mary Jo's murder. Respondent's argument that appellant agreed to talk to Dr. Lunde in an attempt to throw suspicion away from himself is pure conjecture.

Third, there is a vast difference between a defendant talking to police officers in the cold and normally hostile atmosphere of a police station and talking to a psychiatrist in the comfortable environment of his office. Regardless of Dr. Lunde's initial advice to appellant that whatever he said could be turned over to the authorities, it is apparent that during the six hours of interviews Dr. Lunde established a relationship of confidence with appellant; yet it is not clear that appellant fully understood and appreciated the nature of that relationship. Apart from any amnesia concerning the events of October 18, for appellant to have done what he was charged with doing, he obviously was suffering from severe mental and emotional problems; such a condition mandates clear and independent proof of compliance with the *Miranda* requirements before the interviews with Dr. Lunde.

In summary, the prosecution failed to meet its heavy burden of demonstrating appellant's knowing and intelligent waiver of his *Miranda*

rights before his interviews with Dr. Lunde. ■ Moreover, the error in admitting the incriminating statements must be deemed prejudicial. ". . . before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 828, 24 A.L.R.3d 1065].) We cannot find beyond a reasonable doubt that appellant's incriminating statements to Dr. Lunde did not contribute to his conviction of Mary Jo's murder. (See Witkin, Cal. Criminal Procedure (1975 Supp.) § 741B, pp. 817-819.)

The judgment is reversed.

Brown (G. A.), P. J., and Carter, J.,* concurred.

A petition for a rehearing was denied June 4, 1976.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.