[Crim. No. 17867. First Dist., Div. Three. Mar. 22, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
RUSSELL WAYNE McNEAL et al., Defendants and Appellants.

[Crim. No. 17868. First Dist., Div. Three. Mar. 22, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
RUSSELL WAYNE McNEAL, Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, Dennis P. Riordan and Thomas N. Griffin, Deputy State Public Defenders, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Michael Buzzell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SCOTT, J.**—Appellants Russell McNeal and Nathan Nix were convicted, after trial by jury, of violation of Penal Code section 211 (robbery), and violation of Penal Code section 459 (burglary). Appellant Nix also was found to have used a firearm in the commission of the robbery and the burglary. Appellant McNeal was also found to be in violation of his probation for a previous violation of Penal Code sections 236 (false imprisonment), 221 (assault with intent to commit a felony), and 594 (vandalism).

In the early morning hours of April 25, 1977, the victim, Allen Fawkes, was awakened in his home by three intruders who wore rubber masks: one described as a blackish-green witch's face, another as a fox or a wolf, and the third as a large bald head. The masks completely covered the heads of the intruders. The individual wearing the witch's mask held a flashlight and a shotgun or rifle. Fawkes was robbed of a small quantity of marijuana, his wallet and two .22 caliber rifles. Within a few hours

after the robbery, appellants and their juvenile coparticipant[1] were arrested.

The principal issue raised by appellants is whether the court erred in failing to ascertain if good cause existed for excusing one of the jurors. We conclude that the court erred, requiring a reversal of the convictions.

In the afternoon of the first day of jury deliberations, the jury foreman sent a note to the trial judge, resulting in an in-chambers discussion with the foreman, with all counsel and appellants present. The note itself is not in the record. However, a colloquy between the court and the foreman regarding the note was as follows:

"Q. Your note indicates that one of the jurors has some personal knowledge that was brought about from the testimony of the last defense witness, and says it has definitely had a bearing on the way she will vote. Has she discussed what this knowledge is?

"A. Yes, she has, to a point.

"Q. To a point?

"A. She mentioned a couple of names, and that's about it."
Counsel indicated they wished to talk to the juror. The court then recessed for the day and separated the jury.

The following morning, before commencement of jury deliberations, counsel for McNeal suggested the foreman's statements required a formal hearing pursuant to Penal Code section 1120, so that the court could determine whether good cause existed to discharge the juror. The district attorney also asked that the juror be interrogated and that the court further ascertain if other jurors had been tainted. Penal Code section 1120 provides: "If a juror has any personal knowledge respecting a fact in controversy in a cause, he must declare the same in open court during the trial. If, during the retirement of the jury, a juror declare a fact which could be evidence in the cause, as of his own knowledge, the jury must return into court. In either of these cases, the juror making the statement must be sworn as a witness and examined in the presence of the parties in

---

[1]The juvenile, Peter S., was processed through juvenile court. The order finding that he came within section 602 of the Juvenile Court Law (Welf. & Inst. Code, § 500 et seq.) in that he committed a robbery in violation of Penal Code section 211 was affirmed by Division One of this court in its unpublished opinion (1 Civ. 42597, 1978).

order that the court may determine whether good cause exists for his discharge as a juror."

During further discussions with counsel as to how to proceed, the court declared, *"I'm not going into the facts."* The judge ultimately decided to requestion the foreman "to find out from him what specifically, *not the facts,* but rather whether it was her [the juror] request or just his idea that brought this note." (Italics added.) The foreman was again brought into chambers and was asked by the judge how the note came about. "Did the juror ask to have it sent?" The foreman answered, "Yes. She just broke down and said that there was some—that she had too much to lose, and it would definitely affect her decision now." The foreman then identified the juror as Jessie Exline. After this brief discussion with the foreman, Juror Exline was brought into chambers and verified that she had read the note before it had been sent to the court. The judge told the juror he wanted to ask her "a couple of questions." "You can just answer yes or no, *and we don't want to go into factual matters."* (Italics added.) The judge then asked the juror if she could deliberate fairly and impartially in the matter, to which Juror Exline answered, "Well, after giving it some thought, since yesterday, I still can't find that I can say 'guilty' when I can't believe it." Just what the juror meant by her statement was not pursued. Instead, the judge said, "Well, I don't think that's exactly what I'm asking." Further questions were asked of the juror as to whether she could deliberate fairly and impartially, to which she answered, "Yes." The prosecutor then said, "Well, the note indicates that maybe Mrs. Exline has information outside the evidence, outside the things that were just presented to the court." The court thereupon asked the juror, "Do you feel you could set that aside and judge the case on the evidence?" She replied, "Yes." The jury was then instructed to resume their deliberations.

■ Appellants contend the trial court erred in not conducting a hearing as required by Penal Code section 1120; in particular, appellants object to the court's failure to inquire into the facts of the juror's knowledge. We agree that the court's inquiry was inadequate under the circumstances.

Penal Code section 1123 provides a mechanism by which a juror can be excused after the court determines there is "good cause" to support a

conclusion that the juror is unable to perform his duty.[2] Included within the scope of that section is a juror who claims personal knowledge of a fact which could be evidence in the cause, according to section 1120.

■ The hearing requirements under Penal Code section 1120 are explicit. If the court is put on notice that a juror has declared personal knowledge of a fact in controversy, the court is under an obligation to determine whether that knowledge means there is good cause to discharge that juror. In such a situation, the juror must be *sworn* and examined. While a hearing with sworn testimony by the juror is required by section 1120, it appears that a less formal inquiry is adequate to determine "good cause" to discharge a juror under other circumstances.

In *People* v. *Compton* (1971) 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537], the court, referring to Penal Code sections 1089 and 1123, stated, "the trial court has at most a limited discretion to determine that the facts show an inability to perform the functions of a juror, and that inability must appear in the record as a demonstrable reality." (See also *People* v. *Collins* (1976) 17 Cal.3d 687, 696 [131 Cal.Rptr. 782, 552 P.2d 742].) In *People* v. *Manriquez* (1976) 59 Cal.App.3d 426, 432 [130 Cal.Rptr. 585], the court stated: "A hearing under sections 1123 and 1089 should be summary in nature and scope. (*People* v. *Tinnin* (1934) 136 Cal.App. 301, 318-319 [28 P.2d 951]; *People* v. *Abbott* (1956) 47 Cal.2d 362, 371 [303 P.2d 730].) The hearing, though not a full-scale adversary hearing nonetheless should be complete enough to determine 'good cause.' (Cf. *People* v. *Huff* (1967) 255 Cal.App.2d 443, 448 [63 Cal.Rptr. 317]; *Mitchell* v. *Superior Court* (1962) 207 Cal.App.2d 643, 649 [24 Cal.Rptr. 671].)"

■ The question presented here is whether, based upon the information available to the court, a more extensive hearing should have been conducted. We conclude that the record is abundant with statements that should have alerted the court to the requirement of an inquiry into the factual basis of the juror's original concern.

According to the foreman, in addition to stating that she had personal knowledge brought about by the testimony of the last witness (defense

---

[2]Penal Code section 1123 provides, in pertinent part: "If before the jury has returned its verdict into court, a juror becomes sick or upon other good cause shown to the court is found to be unable to perform his duty, the court may order him to be discharged." The balance of section 1123 and section 1089 provide for the manner of selection of alternate jurors, or for the declaration of a mistrial in the event there are no alternates.

witness Francis Rogers), the juror "mentioned a couple of names, and that's about it." That statement creates something of a mystery as to just what the juror said and whether it was said only to the foreman or to other jurors as well. The next day, the foreman offered the additional, equally mystifying information that Juror Exline "just broke down" and said "she had too much to lose." From that statement one could speculate as to any number of possible improper influences being brought to bear upon the juror. It appears also from the statement that the foreman had not divulged everything he knew about the problem with Juror Exline in his first conference with the judge. The situation became more complicated during the court's discussion with Juror Exline herself, when she stated she could not say "guilty" when she didn't believe it, as if she was expected to vote to convict appellants even if she didn't believe them to be guilty; however, the court did not make any inquiry for clarification of that statement.

Respondent contends that an adequate inquiry was made by the court, to wit, a determination that the juror could be fair and impartial. The cases cited by respondent, however, are inapposite. It is not enough for the juror alone to evaluate the facts and conclude that they do not interfere with his or her impartiality. (See *People* v. *Farris* (1977) 66 Cal.App.3d 376, 386-387 [136 Cal.Rptr. 45].) In *Farris* and in *People* v. *Franklin* (1976) 56 Cal.App.3d 18 [128 Cal.Rptr. 94], the court determined the factual basis for the possibility that the juror would be unable to discharge his duties properly, and then *further* inquired as to whether the juror could be fair and impartial. In the instant case, the court failed to ascertain the facts which might impair the impartiality of the juror. Once the court is alerted to the possibility that a juror cannot properly perform his duty to render an impartial and unbiased verdict, it is obligated to make reasonable inquiry into the factual explanation for that possibility.

Requiring such an inquiry is not inconsistent with *People* v. *Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742]. In that case a juror was dismissed when she asked to be excused after deliberations had begun, claiming she was unable to make a decision based on the law and the evidence. During extensive questioning by the court, the juror stated she was involved emotionally more than intellectually, and repeatedly insisted that she could not follow the court's instructions, and that she had been upset throughout the trial. The court discharged her and substituted an alternate. The defendant challenged that discharge. Among other contentions, he argued the court's inquiry was inadequate because it did

not elicit any factual basis to support good cause for the discharge (at pp. 695-696). The Supreme Court disagreed. The juror's inability to deliberate impartially was clear. Once the trial court determined that she had not been coerced or subjected to duress during deliberations, no further factual inquiry into the basis of her distress was necessary or useful (at p. 696).

In contrast here, the court's cursory questioning of Juror Exline did not justify its conclusion that she could properly perform her duties as a juror. Despite her provocative comments that she had "too much to lose" and that she couldn't "say guilty" when she didn't believe it, the court did not determine whether she had been subjected to some kind of duress. Here the court's failure to make at least a minimal factual inquiry left unresolved the essential question: Juror Exline's ability to deliberate impartially.

Respondent also argues that a formal hearing pursuant to Penal Code section 1120 was not required because nothing in the record indicates that the juror declared that she had information as to facts which could be *evidence* in the case. However, it is apparent that the trial court intentionally avoided questioning the juror as to the facts of her personal knowledge. The appellants, therefore, cannot be faulted for not pointing to the "facts" possessed by the juror which would be evidence. It was also necessary for the court to determine whether other jurors had become aware of any statements by Juror Exline, and if so, whether their impartiality would be influenced thereby. Once a court is put on notice of the possibility that improper or external influences are being brought to bear on a juror, it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged and whether the impartiality of other jurors has been affected.

We now turn to an evaluation of whether the court's error requires reversal. We are mindful that a presumption of prejudice arises from juror misconduct, and that in the absence of evidence to rebut the presumption, reversal is required. (*People* v. *Honeycutt* (1977) 20 Cal.3d 150 [141 Cal.Rptr. 698, 570 P.2d 1050].) Here there is no evidence of juror misconduct. What Juror Exline knew and what she meant by her statements are not a part of the record. We cannot assume that because Juror Exline had some "personal knowledge" and "mentioned a couple of names," she was guilty of misconduct of the sort criticized in *People* v. *Lambright* (1964) 61 Cal.2d 482 [39 Cal.Rptr. 209, 393 P.2d 409] (juror reading newspaper accounts); *People* v. *Conkling* (1896) 111 Cal. 616 [44

P. 314]) juror conducting his own investigation); and *People* v. *Honeycutt, supra* (juror receiving extrajudicial legal advice). However, in each of those cases, whether there was misconduct could be determined from the facts. Here, further inquiry might have demonstrated that there was misconduct, or although there was no misconduct, the juror should be discharged because of her personal knowledge, or that there was no misconduct, personal knowledge, or other good cause for discharging the juror.

An evaluation of whether the error was prejudicial must have as its foundation the defendant's right to a jury trial by a fair and impartial jury, as provided by the California Constitution, article I, section 16. (*People* v. *Diaz* (1951) 105 Cal.App.2d 690, 697 [234 P.2d 300].) ■ It is evident that a purpose of Penal Code sections 1089, 1120, and 1123 is to provide a vehicle for the dismissal of a sworn juror when facts are discovered from which it can reasonably be concluded that the juror, originally thought to be unbiased, actually cannot be fair and impartial. It necessarily follows that in such situations, as in the case at bench, where the fact of a sworn juror's impartiality comes into question as a result of that juror's conduct or statements during the course of the trial or the deliberations, the failure of the court to make at least a preliminary inquiry into the facts of such impartiality cannot be said to be error harmless beyond a reasonable doubt. ■ We conclude, therefore, that the court's failure to make an appropriate inquiry into the facts in order to determine whether they constituted good cause for discharge of the juror constitutes reversible error.

We have examined the remaining contentions of appellants and conclude that they do not merit publication. A discussion of some of those contentions is necessary, however, to assist the court in the event of retrial. Preferably there would be a partial publication rule available for these circumstances. ■ ■ ■ Absent such a rule, the balance of the opinion will be placed in a footnote.[3] (See *Golden Gate Bridge etc. Dist.* v. *Muzzi* (1978) 83 Cal.App.3d 707 [148 Cal.Rptr. 197].)

Judgments are reversed. The order revoking appellant McNeal's probation is affirmed.

White, P. J., and Feinberg, J., concurred.

---

[3]Appellants contend that the trial court erred in not suppressing observations made by a police officer as to what he saw in appellants' car the night before the robbery.

(4) Appellants contend that the initial stop of April 24, 1977, by Officer Schmidt was illegal, and that any fruits of that detention, including Schmidt's testimony as to what he

observed in the car, should have been suppressed. Appellants also contend their arrest on the night of the robbery was the direct result of the previous night's illegal stop; therefore, they argue, any evidence seized as a consequence of that second arrest should also have been suppressed. We conclude that there was sufficient cause for the stop and detention. Therefore, it is unnecessary to address appellants' latter contention.

The Supreme Court has recently set forth guidelines as to the propriety of investigative stops or detentions in *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957]. In regard to such detentions, the court stated (at p. 893): "Balancing these factors, the courts have concluded that in order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience *(People v. Superior Court (Kiefer) supra,* 3 Cal.3d at p. 827), to suspect the same criminal activity and the same involvement by the person in question. The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. (*Terry v. Ohio, supra,* 392 U.S. at p. 22 [20 L.Ed.2d at pp. 906-907].)" [Fn. omitted.]

On April 24, 1977, the night before the robbery involved here, Officer Schmidt of the Arcata Police Department was patrolling the downtown area of that city. At approximately 4:30 a.m., Schmidt observed an unfamiliar red and white Chevrolet traveling on a street in a high crime area; the vehicle stopped at a stop sign. About three minutes later, Officer Schmidt saw the same car in the same location. The car again stopped at the stop sign. No stores or restaurants were open. Although the car was not speeding or moving erratically, Schmidt decided that the car was "suspicious." He testified, "It seemed to be driving around without apparent destination." He thought he should "check it out."

We conclude that the lateness of the hour and the reappearance of the unfamiliar car in a high crime area, when all businesses were closed, are sufficient articulable facts upon which the officer in the instant case could reasonably base his decision to stop and investigate the automobile.

(5) Appellants also contend that even if the detention was proper, the scope of the subsequent alleged search was improper. When Officer Schmidt stopped the vehicle, he found the driver, appellant McNeal, was unlicensed. Schmidt cited him for violation of Vehicle Code section 12500 (driving without a license). Two other individuals were in the car: appellant Nathan Nix and a juvenile, one Peter S. Schmidt determined that Nix had a license, and instructed him to drive.

Schmidt checked the interior of the car with a flashlight. Observing a beer can between the passenger seat and car door, he opened the door to retrieve the can, which was open and almost empty. He then looked on the floor in the back seat, where he discovered a wooden stick protruding from under a jacket; the stick "appeared to be a billy." He investigated the item, which he determined was a nunchaku, an illegal weapon. (Pen. Code, § 12020.) He then looked throughout the interior of the vehicle, and saw some "rubberized items which looked a little unusual." Unrolling them, he found three rubber masks: one a wolf's head, one an old man, one a witch. He seized the nunchaku and arrested McNeal for its possession. He did not take the masks. Appellant Nix drove the car away.

When Officer Schmidt saw the beer can through the car window, that observation constituted probable cause for his further examination of the vehicle to ascertain whether other open cans were in the car. Similarly, once he observed the illegal nunchaku, he had probable cause to believe other weapons might be inside the car, and further search was justified. (See *People v. Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 817 [91 Cal.Rptr. 729,

478 P.2d 449, 45 A.L.R.3d 559].) His observation of the three masks was not outside the scope of that search.

We conclude that the observations and the search made subsequent to the detention were proper.

(6) Appellants next contend that the trial court erred in admitting evidence of appellant Nix's prior statement to Officer Schmidt. During the April 24 detention, Officer Schmidt asked the appellants about the masks in the car. Appellant Nix stated the masks belonged to his children. On cross-examination of Officer Schmidt at trial, appellants' counsel asked Schmidt if he had any way of linking the masks to the occupants of the car. Schmidt replied, "Yes." On redirect the prosecutor asked, over objection, how Schmidt connected the masks and the occupants. Schmidt replied that Nix stated the masks belonged to his children.

Appellants contend that the trial court erred in admitting the statements without a hearing outside the presence of the jury to determine whether Nix had been properly warned according to *Miranda.* (*People* v. *Bennett* (1976) 58 Cal.App.3d 230 [129 Cal.Rptr. 679].)

Respondent correctly argues that the statements made by appellant Nix were not made during an interrogation designed to elicit incriminating information so as to require a *Miranda* warning. (*People* v. *Manis* (1969) 268 Cal.App.2d 653 [74 Cal.Rptr. 423].) Nothing in the record indicates that appellant Nix was suspected of owning the illegal nunchaku; it was appellant McNeal who was subsequently arrested for its possession. Nor was Nix being interrogated by Officer Schmidt as a suspect in a crime involving the masks. The officer's question was a neutral inquiry. He was not attempting to elicit incriminating statements about the masks; he was not focusing on Nix as an accused. This situation cannot fairly be characterized as a custodial interrogation designed to elicit incriminating statements; consequently, a *Miranda* warning was not required before Officer Schmidt asked about the masks.

There was no error in admitting Nix's statement.

(7) Appellant McNeal contends that if the robbery conviction is reversed, the order revoking probation should also be reversed and the cause remanded for resentencing. Appellant properly states that the determination to revoke probation is largely discretionary. (*In re Coughlin* (1976) 16 Cal.3d 52, 56 [127 Cal.Rptr. 337, 545 P.2d 249].) Appellant states that after his conviction of robbery, a prison sentence was mandatory, because Penal Code section 1203.06, subdivision (a)(1)(iii) (applicable to appellant because his offense was committed prior to July 1, 1977) prohibited probation for any person who used a firearm during the commission of a robbery. Consequently, appellant argues, the revocation of his earlier probation was inevitable because that probation was inconsistent with the mandatory prison sentence required by Penal Code section 1203.06. Thus, appellant concludes, the trial court was unable to exercise its discretion in determining whether his probation should be revoked.

Respondent argues that the trial court did exercise its discretion when it revoked appellant's probation. The record does not support appellant's assertion that the trial court failed to exercise discretion in its decision to revoke his probation. Nothing in the record indicates the trial court believed it had no discretion in that matter. The court stated it had considered the probation report and had heard all of the trial; the court also treated the revocation of probation and the sentencing on the robbery conviction as two separate matters.

In *People* v. *Hayko* (1970) 7 Cal.App.3d 604, 611 [86 Cal.Rptr. 726], the specified basis for a trial court's revocation of probation was a *conviction* which was declared invalid on appeal because of an illegal search and seizure. The appellate court reversed the order revoking probation, stating, "We do not know whether the court would have taken the same action regarding appellant, just on the basis of the contraband seized, if there had not been a trial and conviction" (p. 611).

In contrast here, the record does not indicate that the trial court specified the *conviction* as the basis for its revocation of probation. Apparently, it considered the probation report

and all the evidence heard at trial. The court is authorized to revoke probation if it "has reason to believe from the report of the probation officer or otherwise" that the probationer has violated terms of his probation. (Pen. Code, § 1203.2, subd. (a).) **(8)** The standard of proof to be used by the trial court in assessing whether there exists "reason to believe" the probationer has violated his probation has been stated as "clear and satisfactory," "clear and convincing," and "proof by a preponderance of the evidence"; the standard is not proof beyond a reasonable doubt. (*In re Coughlin, supra,* 16 Cal.3d at p. 56.)

Here it appears that the trial court concluded from the probation officer's report and the evidence introduced at trial that there was reason to believe appellant had violated the terms of his probation; that determination will not be disturbed on appeal.