Filed 9/29/23  P. v. Uriquidez CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Tehama)

----

| | |
|---|---|
| THE PEOPLE, | C096228 |
| Plaintiff and Respondent, | (Super. Ct. No. 21CR900005) |
| v. | |
| ALEJANDRO LEON URIQUIDEZ, | |
| Defendant and Appellant. | |

A jury found defendant Alejandro Leon Uriquidez guilty of sex offenses committed against three child victims, I.C., A.C., and C.V.  On appeal, defendant raises three arguments:  1) the trial court did not make a reasonable inquiry into a juror's impartiality; 2) there is insufficient evidence to support one of defendant's aggravated lewd conduct convictions; and 3) the fines and fees imposed by the trial court were incorrect.  We agree as to the amount of the fines and fees and order they be modified but otherwise affirm the judgment.

1

BACKGROUND

Maria C., who is I.C. and A.C.'s mother and C.V.'s grandmother, was in a relationship with defendant. During the relationship, defendant lived with Maria C. and the three victims (I.C., A.C., and C.V.) and sexually abused them. The prosecution charged defendant with 10 counts of forcible lewd conduct (Pen. Code, § 288, subd. (b)(1)[1]; counts 1 through 8, 10, & 14), four counts of forcible sodomy (§ 286, subd. (c)(2); counts 9, 13, 16, & 18), four counts of rape (§ 261, subd. (a)(2); counts 11, 12, 15, & 17), and one count of continuous sexual abuse (§ 288.5, subd. (a); count 19). The prosecution also alleged multiple victim aggravating circumstances as to all counts. (§ 667.61, subd. (e)(5).)[2]

We will provide a brief summary of the evidence for context; more detailed facts are provided below, as relevant to the issues on appeal. I.C. testified about several incidents in which defendant sexually abused her. Defendant would come into her bedroom and abuse I.C. "mostly every night." He also pretended to wrestle with her and groped her while doing so. In addition, defendant abused I.C. when he was driving her to school and to the store, beginning when she was in first grade and continuing through sixth grade. I.C. also testified about an incident where defendant raped her.

To keep her in line, defendant would threaten to harm I.C.'s mother and baby sister if I.C. did not do what she was told. In one specific incident, I.C. refused to have sex with defendant so he raped A.C., her deaf sister. I.C. recounted other specific incidents of abuse. Altogether, defendant continuously abused I.C. from the time she was

---

[1] Undesignated statutory references are to the Penal Code.

[2] Defendant correctly points out that the information's allegations relating to section 667.61, subdivision (e)(5) are incorrect and, instead, the correct reference should be to section 667.61, subdivision (e)(4), as each allegation states defendant committed his misconduct on more than one victim.

5 or 6 years old until she was 13 years old, and only abstained from abusing her for about one month during that period.

C.V. testified defendant sexually abused her and then threatened her afterwards. More detail about the circumstances will be provided *post*. A.C. testified defendant raped and abused her on a regular basis from the time she was 10 years old until she was 15 years old.

Following a five-day jury trial, the jury found defendant guilty of all counts and found true the aggravating circumstance allegations.

At sentencing, the trial court vacated counts 11 through 14 under *People v. Johnson* (2002) 28 Cal.4th 240. The court imposed a sentence of 225 years to life. The court also imposed fines and fees as listed in the probation report, which included a $760 court operations assessment (§ 1465.8), a $570 criminal conviction assessment (Gov. Code, § 70373), and a $500 sex offender fine (§ 290.3), plus applicable penalty assessments adding an additional $1,300.

Defendant timely appealed.

## DISCUSSION

### I

### *Juror Bias*

We begin with defendant's first claim alleging that the trial court did not complete a reasonable inquiry into a juror's impartiality which was first brought to the court's attention after the jury had been sworn and during the presentation of evidence. More specifically, defendant contends that, after Juror No. 6 raised a question about his own impartiality, the trial court did not adequately inquire into the juror's state of mind.

A. *Background*

During jury selection, the trial court read the charges against defendant and asked the jurors, including Juror No. 6, whether they would have any difficulty being fair and

3

impartial in the case, based on those charges.  Juror No. 6 did not indicate he would have any difficulties.  He stated he had two children, ages six and four.

On the morning after I.C. and her mother testified, the juror asked to speak with the court.  Juror No. 6 explained, "I believe highly in our justice system and how things are conducted, and I want to give the defendant the fair opportunity, and I no longer believe that in myself to be able to give him that."  The juror said he was not trying to say something that he had failed to say before the trial started.  The court asked whether Juror No. 6 had started to form opinions about the case after the trial started, and the juror responded, "It was more when I got home and looked at my daughters, and there's just no way that I would–you know, it's one thing to make accusations towards somebody, and it's completely wrong to make false ones and I agree with that.  But I don't believe that I can hold myself to that standard.  I don't want to be unfair to our justice system."

The trial court asked whether the juror would be able to follow an instruction saying he should decide the case "only on the evidence that you hear and only after you decided if the witness is credible," and Juror No. 6 replied, "I will, but . . . ."  Before Juror No. 6 could complete his comment, the court confirmed Juror No. 6 was not saying, "No matter what the evidence is, I am going to vote a certain way."  Based on further questioning by the court, Juror No. 6 confirmed he would listen to all the evidence before making a final decision about the verdict.

Counsel then had a discussion off the record with the trial court.  The court then confirmed Juror No. 6 could "be fair and listen to all of the evidence before" making up his mind about the verdict, would wait until the evidence was in and argument was done before forming an opinion as to the verdict, and had not already made up his mind about how to vote.  The court explained that further evidence could inform the juror's opinions and that argument from counsel could help explain how the evidence fit into the law, and the juror assured the court he would wait until he had heard "all of the witnesses, all the evidence and all the arguments" before reaching a conclusion.

The trial court asked Juror No. 6 two final questions:

"THE COURT: Okay. Anything else that you want to tell us?

"JUROR NUMBER SIX: No.

"THE COURT: All right. Do you think I asked the right questions to get what you're thinking?

"JUROR NUMBER SIX: No."

Juror No. 6 apologized to the trial court for "wasting your time" after which the court thanked the juror for his candor and assured him "it's not a waste of time." After the juror left, the court provided counsel a further opportunity to pose questions, and both declined. Defense counsel then asked to remove Juror No. 6, arguing defendant could not receive a fair trial, despite the juror's "technically" correct answers. The trial court denied the request, explaining:

"First of all, the juror articulated his desire to be fair, and he actually said he does– he–well, when he articulated his concern, he said that the defendant–something to the effect that the defendant needs a fair trial, and he was concerned that he couldn't be fair; and it was because–and then he started talking about he knows that people can make false accusations, he also mentioned the fact that he looked at his daughters.

"So, we can make inference from that that he's–he's maybe leaning one way or the other, but the truth is we don't know what the evidence yesterday and–or how that affected him and how look[ing] at his daughter[s] affected him. It could [be] that that [e]ffect was such that he was leaning towards the prosecution, but, frankly, it–it could have meant that–with his mention of false accusations and listening to the testimony yesterday, that he didn't believe the–the witness.

"I–I thought it was important not–not to get him to tell his ultimate bias, but I think the only way to do that is ask him questions; and he appeared to be credible when he was asked whether he still could be fair, which he said he could. Whether he had

5

made up his mind and he said he had not. Will he wait to hear all the evidence and the argument until he decides, he said he could.

"I think we have a very conscientious juror who was worried, after he started forming opinions, after listening to the case, which is very normal, I would think. Just because he has that extra sense or urging to speak with us about his concern. Really his concern was to have a fair jury, and I still think he presents as a fair juror, because he is willing to follow the law. He is willing to continue to be fair. He's willing to still have an open mind, and I didn't think this discussion was any different than we have with jurors during–during the jury selection. The only difference was that we had a discussion during the trial instead of before–before the trial.

"With that said, because he appeared very credible when he said he still could be fair in his desire to be a fair juror, I think that it would be inappropriate to dismiss him, so he will remain on the jury."

B.      *Analysis*

" 'An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is " 'capable and willing to decide the case solely on the evidence before it' " [citations].' " (*People v. Hensley* (2014) 59 Cal.4th 788, 824.)

A trial court may discharge a juror for good cause at any time if it finds the juror is unable to perform their duties. (§ 1089; *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 69 (*Allen*); *People v. Lomax* (2010) 49 Cal.4th 530, 588 (*Lomax*).) When a court is apprised of information which, if proven true, would constitute good cause for a juror's removal, it must conduct whatever inquiry is reasonably necessary to determine whether the juror should be discharged. (*Allen*, at p. 69; *Lomax*, at p. 588.) Whether and how to hold such a hearing is a matter within the court's discretion, as is the ultimate decision whether to discharge or retain a sitting juror. (*Allen*, at p. 70; *People v. Holloway* (2004) 33 Cal.4th 96, 124-125 (*Holloway*); *Lomax*, at p. 589.)

6

However, to support a decision to discharge a juror, a " 'somewhat stronger showing' than is typical for abuse of discretion review must be made to support such decisions on appeal.  [Citations.] . . . [T]he basis for a juror's disqualification must appear on the record as a 'demonstrable reality.'  This standard involves 'a more comprehensive and less deferential review' than simply determining whether any substantial evidence in the record supports the trial court's decision.  [Citation.]  It must appear 'that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established.'  [Citation.]" (*Lomax, supra*, 49 Cal.4th at p. 589.)  Conversely, where substantial evidence supports a trial court's conclusion that a juror is able to serve impartially, and no inability to do so appears as a demonstrable reality in the record, the court's failure to discharge the juror is not an abuse of discretion.  (*Holloway, supra*, 33 Cal.4th at p. 126.)

The fact that Juror No. 6 initially expressed concerns to the trial court does not mean he could not be an impartial juror or needed to be immediately discharged.  During trial, jurors are required to "maintain an open mind, consider all the evidence, and subject any preliminary opinion to rational and collegial scrutiny before coming to a final determination." (*Allen, supra*, 53 Cal.4th at p. 75.)  Thus, the trial court's inquiry appropriately focused on Juror No. 6's ability to do these things, even if he may have formed an initial opinion in the case based on the first day of testimony.  The court questioned Juror No. 6 about whether he could consider all the evidence, keep an open mind, and carefully take into consideration the evidence and arguments before reaching a final verdict.  And, the court asked Juror No. 6 the open-ended question about whether he had anything else he wanted to share; significantly, he replied that he did not.  Following this discussion, the court found Juror No. 6 to be "credible" and "conscientious," noting his willingness to keep an open mind, despite forming some initial opinions about the case.

Following our review of the trial court's questions and the juror's responses to those questions, we believe the trial court could have "reasonably conclude[d] the juror was trying to be honest" about his opinion of the testimony up to that point "but was also sincerely willing and able to listen to the evidence and instructions and render an impartial verdict based on that evidence and those instructions." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 488.) "A reviewing court must allow the trial court to make this sort of determination. The trial court is present and able to observe the juror itself. It can judge the person's sincerity and actual state of mind far more reliably than an appellate court reviewing only a cold transcript." (*Id.,* at pp. 488-489.)

Defendant argues Juror No. 6's final statement that the trial court had not asked the "right questions" makes this case similar to *People v. McNeal* (1979) 90 Cal.App.3d 830, 836, which found error in a trial court's decision not to inquire into the factual basis of a juror's bias after the juror sent an ambiguous note indicating she had "information outside the evidence" that could affect her impartiality. Here, however, the trial court *did* inquire as to the source of the information that Juror No. 6 was concerned about, and determined the juror's fears of bias were based on the testimony he heard, rather than something that occurred before trial or outside the courtroom. Thus, unlike *McNeal*, the trial court eliminated the possibility of "improper influences" into Juror No. 6's deliberations. (*Id.* at p. 838.) Juror No. 6's statement came after hearing difficult testimony in a case concerning child sexual abuse, which likely evoked strong emotional reactions. In this context, it was reasonable for the trial court to conclude the juror may have formed a preliminary opinion necessitating an inquiry into whether he could keep an open mind and consider the remaining evidence before making a final decision. Once the court had confirmed this was the case, and in the absence of any further communications from the juror or evidence he refused to deliberate or consider the evidence, no further inquiry was required. (*Lomax, supra*, 49 Cal.4th at p. 592.) We see no abuse of discretion in the court's inquiry.

8

II

*Insufficient Evidence*

Relying on *People v. Schulz* (1992) 2 Cal.App.4th 999 and *People v. Senior* (1992) 3 Cal.App.4th 765, defendant argues insufficient evidence supports count 10 because there was no evidence he used force or duress against C.V. when he abused her. We disagree.

A.      *Background*

C.V., who was 23 years old at the time of trial, testified for the prosecution. Once, when C.V. was in elementary school, defendant asked her if she wanted to play a game, then lifted her in the air from behind. Defendant threw her in the air, then slipped his hands under her clothes and held her in the air with his hands on her chest. C.V. described his conduct as "weird," saying she felt scared and could still feel his hands on her. She knew "what was going on was not okay," but did not say anything to defendant at the time because he was so much taller than she was. She froze when he held her and ran away as soon as he put her down. She was upset and crying. A few days later, defendant took her to a bedroom, grabbed her arms, and asked her if she enjoyed what he had done. He tried to pull her closer and she pushed him away; he said that if she said anything to anyone, he would do the same to her sisters.

B.      *Analysis*

" ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the

9

existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 626.)  "[O]ur task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ' " 'be reasonably reconciled with the defendant's innocence.' " ' [Citations.]  The relevant inquiry is whether, in light of all the evidence, a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Gomez* (2018) 6 Cal.5th 243, 278.)

Section 288, subdivision (a), prohibits any person from committing a lewd or lascivious act on a child under the age of 14 "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child."  Section 288, subdivision (b)(1), further prohibits the commission of such a lewd or lascivious act "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person."  " 'Force, in this context, means physical force that is " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' " ' " *(People v. Jimenez* (2019) 35 Cal.App.5th 373, 391.)

" 'A defendant uses "force" if the prohibited act is facilitated by the defendant's use of physical violence, compulsion or constraint against the victim other than, or in addition to, the physical contact which is inherent in the prohibited act.' [Citation.]  'The evidentiary key to whether an act was forcible is not whether the distinction between the "force" used to accomplish the prohibited act and the physical contact inherent in that act can be termed "substantial."  Instead, an act is forcible if force facilitated the act rather than being merely incidental to the act.' " (*People v. Morales* (2018) 29 Cal.App.5th 471, 480.)  "[A]cts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves" are sufficient to support a finding that the lewd act was committed by means of force.  (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005.)

Citing *People v. Schulz, supra*, 2 Cal.App.4th 999 and *People v. Senior, supra*, 3 Cal.App.4th 765, defendant argues there was no evidence of "any sort of struggle," and

that any force was "so minimal that it fails to reach the level . . . necessary to sustain the judgment." Both *Schulz* and *Senior* have been roundly rejected by multiple courts, including this court, however, and we do not find them persuasive. (See, e.g., *People v. Neel* (1993) 19 Cal.App.4th 1784, 1790, disapproved on other grounds by *People v. Soto* (2011) 51 Cal.4th 229; *People v. Aguilar* (2019) 41 Cal.App.5th 1023, 1027; *People v. Babcock* (1993) 14 Cal.App.4th 383, 387-388.)

Here, defendant lifted the victim, who was a child in elementary school, up in the air and threw her in the air while fondling her. Even at the time, the conduct disturbed her, to the extent that when she testified, more than ten years later, she said she could "still feel his fucking hands on me." She described being "frozen" and said she could not do or say anything at the time because she was "a kid and he was an adult," and "he was a lot taller." After he put her down, she ran away and cried. The disparity in age and size between the victim and defendant, as well as the fact defendant was holding the victim and throwing her up in the air, is enough to find defendant used force. Defendant restrained the victim in a way that was more than merely incidental to the lewd act, and we conclude there was sufficient evidence for the jury to convict defendant on this count.

III

*Fines and Fees*

Defendant argues the trial court imposed excessive court operations and criminal conviction assessments, as well as an excessive sex offender fine and associated penalty assessments. The People concede the errors. We agree with the parties and will modify the judgment accordingly.

Section 1465.8, subdivision (a)(1) required a $40 per count assessment to fund court operations, and Government Code section 70373, subdivision (a)(1) requires a $30 per felony count assessment to fund court facilities. Here, the probation report calculated each of these assessments assuming defendant had 19 convictions. At the sentencing hearing, however, the trial court vacated the convictions on four of the counts, consistent

11

with *People v. Johnson, supra*, 28 Cal.4th 240.  Thus, the court should have imposed these assessments based on the final 15 convictions, rather than the initial 19 convictions.  We will modify the judgment and direct the court to update its records.  (See *People v. Rivera* (2019) 7 Cal.5th 306, 349.)

Similarly, section 290.3, subdivision (a) provides "[e]very person who is convicted of any offense specified in subdivision (c) of Section 290 shall, in addition to any imprisonment or fine, or both, imposed for commission of the underlying offense, be punished by a fine of three hundred dollars ($300) upon the first conviction or a fine of five hundred dollars ($500) upon the second and each subsequent conviction, unless the court determines that the defendant does not have the ability to pay the fine."  Here, the probation report recommends a single $500 fine, plus applicable penalty assessments, but a $500 fine is only available for the second and subsequent convictions, and the trial court did not impose a $300 fine for the first conviction.  We agree with the parties that the trial court's imposition of a single fine implies a finding defendant did not have the ability to pay fines for his second and subsequent convictions, and that it was improper for the court to impose a $500 fine, rather than a $300 fine.  (*People v. Burnett* (2004) 116 Cal.App.4th 257, 261.)  We will modify the judgment to reduce the fine and the accompanying penalty assessments.

## DISPOSITION

The judgment is modified to reduce the court operations assessment (§ 1465.8) to $600 and the criminal conviction assessment (Gov. Code, § 70373) to $450.  The sex offender fine (§ 290.3) is reduced to $300, which, in addition to applicable penalty assessments listed in the probation report, totals $1,080.  The trial court is directed to amend the abstract of judgment and send a certified copy to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.


/s/_____,
WISEMAN, J.*


We concur:


/s/_____,
MAURO, Acting P. J.


/s/_____,
MESIWALA, J.

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.