Filed 5/18/21 P. v. Osby CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID OSBY,<br><br>    Defendant and Appellant. | B299496<br><br>(Los Angeles County Super. Ct. No. BA438205)<br><br>**ORDER MODIFYING OPINION**<br> [There is no change in judgment] |

THE COURT:

It is ordered that the opinion filed on April 22, 2021, is modified as follows:

(1) On page 3, second full paragraph, line 1, after "We" insert: "conclude that substantial evidence supports the robbery conviction, however, we"

(2) On page 5, after the main heading "**DISCUSSION**", insert the following subheading: "***Sufficiency of the Evidence of Force or Fear***"

(3) Following this subheading, insert:

"Osby contends that there was insufficient evidence to demonstrate that he used force or fear to steal the toilet paper or to retain possession of it when he was pursued by Menjivar, and urges us to reverse the cause without permitting the People to retry the case. (See *People v. Hatch* (2000) 22 Cal.4th 260, 271-272 [double jeopardy bars retrial where evidence was legally insufficient].) We conclude that substantial evidence supports Osby's conviction for robbery.

"In reviewing a challenge to the sufficiency of the evidence under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole* (2004) 33 Cal.4th 1158, 1212.) " ' "[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of

2

fact ....” ’ [Citation.]”  (*People v. Snow* (2003) 30 Cal.4th 43, 66.)

Here, evidence was presented that, when Menjivar confronted Osby, Osby threw the toilet paper to the ground, punched Menjivar five or six times in the face, and called him "bad names."   When Menjivar grabbed the toilet paper, Osby pulled out a knife and lunged at Menjivar, trying to stab him.

Osby argues that he when he threw the toilet paper down to attack Menjivar he was effectively abandoning it, and as a consequence, his subsequent violent actions were not part of the robbery.  While this is one possible interpretation of what occurred, a reasonable juror could conclude that Osby threw the toilet paper aside not to abandon it, but to facilitate his attack on Menjivar, and that the robbery was ongoing until Menjivar successfully retrieved the toilet paper.  Because substantial evidence supports the jury's verdict, we defer to its judgment.”

(4) After the above text, insert the following subheading: “***English Competency of Jurors***”.

There is no change in judgment.

MOOR, J.                                                    RUBIN, P. J.

3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B299496 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA438205) |
| v. | |
| DAVID OSBY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mildred Escobedo and Craig J. Mitchell, Judges.  Reversed.

Edward Mahler, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey,

Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Ryan M. Smith, Deputy Attorney General, for Plaintiff and Respondent.

———————————

In an amended information, defendant and appellant David Osby was charged with robbery (Pen. Code, § 211 [count 1]),[1] resisting an officer (§ 69 [count 2]), and attempted robbery (§§ 211/664 [count 3]). It was alleged that Osby used a deadly weapon, a knife, in the commission of count 1. (§ 12022, subd. (b)(1).) The amended information further alleged that Osby suffered three prior serious felony convictions with respect to counts 1 and 3 within the meaning of the three strikes law. (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d).) With respect to all three counts, it was alleged that Osby suffered three prior serious felony convictions within the meaning of section 667, subdivision (a)(1), and served two prior prison terms (§ 667.5, subd. (b)).

The jury found Osby guilty in counts 1 and 2, but acquitted him in count 3. It found the prior conviction allegations to be true.

Osby was sentenced to a total of 25 years to life in prison, plus a determinate term of 17 years.[2] The court

———————————

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The abstract of judgment erroneously reflects a total determinate term of 16 years.

2

declined to strike Osby's three prior strike convictions and imposed a term of 25 years to life in count 1, plus one year for the knife use enhancement under section 12022, subdivision (b), plus 10 years for two prior serious felony enhancements pursuant to section 667, subdivision (a)(1). The court imposed a full consecutive high term of three years in count 2, doubled to six years pursuant to the three strikes law.[3]

On appeal, Osby contends that (1) he was deprived of his right to a jury comprised of persons with a sufficient command of English; (2) there was insufficient evidence to support his robbery conviction; (3) the trial court failed to declare a doubt as to his competency; and (4) the two 5-year prior serious felony enhancements (§ 667, subd. (a)(1)) must be stricken. The People concede sentencing error, but otherwise contest Osby's challenges to the judgment.

We agree with Osby that the trial court abused its discretion by failing to conduct a reasonable investigation after it learned that there could be good cause to excuse Juror No. 7, and by finding Juror No. 7 had a sufficient command of the English language to serve as a competent juror. Having reached this conclusion, it is not necessary for us to address Osby's remaining contentions. The trial court's judgment is reversed.

---

[3] The trial court dismissed the two one-year prior prison term enhancements under section 667.5 subdivision (b) in the interests of justice.

3

## FACTS

On July 16, 2015, Edwin Menjivar and Hugo Beltran were working at the Dulceria Beltran market. There was a display outside the front door of the market of 48-packs of toilet paper priced at $13 each.

Menjivar was watching the display and saw Osby approach on a bicycle. Osby picked up a package of the toilet paper, balanced it on the handlebars of the bike, and rode away without paying for the toilet paper. Menjivar pursued Osby on foot until he saw a bicycle food delivery man who Menjivar knew and asked the delivery man for help. Menjivar jumped onto the rear axel pegs of the bike, and the two men chased Osby down the street.

They caught up with Osby, and Menjivar told him to return the toilet paper. Osby threw the toilet paper on the ground. Osby then punched Menjivar five or six times in the face and called him "bad names." When Menjivar grabbed the toilet paper, Osby pulled out a knife and lunged at Menjivar, trying to stab him.

Menjivar jumped back on the bicycle and returned to the market with the toilet paper. Osby also returned to the market and demanded that Menjivar return the toilet paper, which Osby claimed was his. Menjivar refused, and Osby again punched Menjivar in the face six or seven times.

Beltran saw the fight. He and another person waived down Los Angeles Reserve Police Officer James Lombardi.

They explained that the market had been robbed and the thief was fighting an employee.

Officer Lombardi ordered the men to stop fighting. Beltran explained the situation to the officer. Officer Lombardi then asked Osby what happened. Osby said he did not know and that he was leaving. Officer Lombardi told Osby that he could not leave. Osby told Officer Lombardi he was going to leave and walked toward a backpack, which he said was his. Officer Lombardi repeated that Osby was not free to leave. Osby said he was leaving again, but Officer Lombardi held his bicycle to prevent him. Osby lunged for his backpack. Officer Lombardi grabbed Osby, but he quickly got loose. Osby knocked the officer to the ground and a struggle ensued.[4] At some point in the struggle Osby's knife fell on the ground. Betran kicked it away so that no one would get hurt. Bystanders helped Officer Lombardi restrain Osby and the officer handcuffed him. Menjivar retrieved the knife and gave it to an officer.

## DISCUSSION

During trial, questions arose regarding whether Jurors No. 6, 7, and 11 were competent to serve on the jury due to an insufficient understanding of English. Although the

---

[4] Although there was some variance in the witnesses' testimony there was basic agreement as to what happened during the struggle. Ultimately, the jury acquitted Osby of the attempted robbery to which the testimony related.

court replaced Juror No. 11 with an alternate juror, it determined that Jurors No. 6 and No. 7 had sufficient command of the language. Osby contends that the trial court abused its discretion by failing to adequately investigate the extent of the jurors' understanding, and by refusing to excuse them despite the fact that their incompetence to serve on the jury was a "demonstrable reality." We agree with Osby with respect to Juror No. 7, and reverse the judgment on that basis.[5]

## *Proceedings*

### Voir Dire

Prior to commencing voir dire, the trial court advised the 50 prospective jurors that it would be asking them all the same set of questions, and described the questions in turn:

"So you are going to give me the last four of your JID . . . and then you are going to tell me what part of L.A. County you reside in because you are all from L.A. County.

---

[5] We include the trial court's examination of Juror No. 6 and Juror No. 11 insofar as it is helpful for context. We express no opinion as to the adequacy of the court's investigation of the English language ability of these jurors, and no opinion on the propriety of the trial court's refusal to excuse Juror No. 6. Juror No. 11 was excused, and there is no challenge on appeal to the appropriateness of the trial court's ruling in that regard.

"I want to know the community, not the address, not the street, just the community such as Mar Vista, Palms, Venice, Pomona, Pasadena, Glendale, Eagle Rock, Koreatown, Chinatown, South Central.

[¶] . . . [¶]

"Then you are going to tell me if you are married, if you're separated, if you are divorced, if you are widowed, if you have a significant other.

"Then I want to know your job, your significant other's job and/or ex, and/or spouse, et cetera.

"Then I want to know the job that everyone has in your home, everyone that is an adult, okay.

"That could be grandma, grandpa, aunt, uncle. It could be a student from another country. I want to know the jobs of all the adults under the roof.

"Then I want to know if you have any adult children living with you or outside, and what their jobs are. Okay.

"They can live anywhere on the planet, I want to know what they do.

"And then I want to know if you've ever served on a jury before. Now, how you answer, that is real simple. If it is no, it is no. If you served on a jury before, whether you were picked or not, whether you went through dismissal or not, I just need to know the following:

"Yes, I've served before. Coming to court is serving. Yes, you've come before, and it was civil or criminal, no verdict or verdict.

[¶] . . . [¶]

"So if it is a yes, it is yes, criminal, no verdict.

"Yes, civil, verdict."

*Juror No. 11*

The court then proceeded to go through the questions one by one with each juror. The court questioned Juror No. 11, then seated as Prospective Juror No. 11, as follows:

"The Court: . . . Juror Number eleven.

"Prospective Juror No. 11: My number , 7414.

"The Court: 7414?

"Prospective Juror No. 11: Yes, I live in La Puenta. I am married. I have two children.

"The Court: Two?

"Prospective Juror No. 11: Yes.

"The Court: What do you do?

"Prospective Juror No. 11: My oldest son just finished college.

"The Court: What do you do?

"Prospective Juror No. 11: House wife.

"The Court: What does your husband do?

"Prospective Juror No. 11: He retired.

"The Court: From what? What did he do?

"Prospective Juror No. 11: My husband, he retired. He first had the restaurant.

"The Court: I am sorry. [¶] Restaurant, I am sorry. [¶] Thank you. [¶] So your husband worked at the restaurant?

"Prospective Juror No. 11:  Yes, before he retired.

"The Court:  Before he retired?

"Prospective Juror No. 11:  Yeah, yeah.

"The Court:  You have two children?

"Prospective Juror No. 11:  Yeah.

"The Court:  How old?

"Prospective Juror No. 11:  One, 23, and older one.

"The Court:  What does the older one do?

"Prospective Juror No. 11:  Finish college.

"The Court:  Studying what?  What does that child want to be?

"Prospective Juror No. 11:  I don't know.

"The Court:  What did she go to school for?

"Prospective Juror No. 11:  Law office.

"The Court:  What did she study?  [¶]  What does she want to be?

"Prospective Juror No. 11:  I don't know how to tell.

"The Court:  She went to school?

"Prospective Juror No. 11:  Yeah.

"The Court:  What did she learn?

"Prospective Juror No. 11:  My older one, she finished the school.

"The Court:  Okay.  [¶]  Does she want to be a doctor, a lawyer, an architect, engineer, a dancer?

"Prospective Juror No. 11:  Like health or something, health with the doctor.

"The Court:  Okay.  [¶]  Next child?

"Prospective Juror No. 11:  High school.

"The Court:  Okay.  [¶]  Have you ever worked outside of the home?

"Prospective Juror No. 11:  Yes.

"The Court:  Where?

"Prospective Juror No. 11:  Before I worked the restaurant.

"The Court:  Yes.

"Prospective Juror No. 11:  Now they are selling the restaurant.

"The Court:  That is why you are back at home?

"Prospective Juror No. 11:  Yeah, back at the home.

"The Court:  Thank you very much.  [¶]  Have you served on a jury?

"Prospective Juror No. 11:  Yes.

"The Court:  You have?

"Prospective Juror No. 11:  Yeah.

"The Court:  Was it criminal or civil?  [¶]  Did you come to jury service before?

"Prospective Juror No. 11:  Yeah.

"The Court:  How long ago?

"Prospective Juror No. 11:  Maybe 2 years ago.

"The Court:  Okay.  Thank you."

*Juror No. 7*

Later, the court questioned Juror No. 7, who was then seated as Prospective Juror No. 15:

"The Court: . . . Okay.  Juror Number 15.

10

"Prospective Juror No. 15:  My number is 3050.

"The Court:  3050?

"Prospective Juror No. 15:  Yeah.

"The Court:  Okay.  What part of the city?

"Prospective Juror No. 15:  L.A.

"The Court:  What part of L.A?

"Prospective Juror No. 15:  It's west L.A.

"The Court:  Okay.  [¶]  Are you married, single?

"Prospective Juror No. 15:  I am married.

"The Court:  Okay.

"Prospective Juror No. 15:  I work.  My job is housekeeper.

"The Court:  Okay.

"Prospective Juror No. 15:  And I have two sons.

"The Court:  What does your husband do?

"Prospective Juror No. 15:  He is retired now.

"The Court:  From what?

"Prospective Juror No. 15:  He was working in painting and in finishing.

"The Court:  Painting and finishing?

"Prospective Juror No. 15:  Yeah.

"The Court:  Is that painting and finishing for homes or for cars or for what?

"Prospective Juror No. 15:  For one company.

"The Court:  But what did the company do cars, homes or what?

"Prospective Juror No. 15:  Furniture.

"The Court: Furniture okay. [¶] The first son, what does that son do?

"Prospective Juror No. 15: He's a social worker.

"The Court: Does he work for Los Angeles County?

"Prospective Juror No. 15: Yes.

"The Court: Does he work for adult social worker or children's social worker?

"Prospective Juror No. 15: I think it is in the high school social worker.

"The Court: Do you know if he goes to court?

"Prospective Juror No. 15: Yes.

"The Court: Does he ever go to court because of work?

"Prospective Juror No. 15: Yes.

"The Court: You know that?

"Prospective Juror No. 15: (Nodding in the affirmative.)

"The Court: Has he talked to you about that?

"Prospective Juror No. 15: Yeah.

"The Court: Has he told you that he's ever come to court to take the stand and talk to the judge and tell the judge what happened?

"Prospective Juror No. 15: I think so, yes, he -- yes.

"The Court: The next son, what does the next son do?

"Prospective Juror No. 15: The same, the social work.

"The Court: Okay. [¶] Have you ever served on a jury?

"Prospective Juror No. 15: Yeah, yes.

"The Court: Was it civil or criminal?

12

"Prospective Juror No. 15:  Criminal.

"The Court:  Did you arrive at a verdict or no verdict?

"Prospective Juror No. 15:  No verdict.

"The Court:  Did you come to a decision or not?

"Prospective Juror No. 15:  Not only -- coming only two days.

"The Court:  And they dismissed you?

"Prospective Juror No. 15:  Yes.

"The Court:  Yes?

"Prospective Juror No. 15:  Yes.

"The Court:  Thank you."

*Juror No. 6*

The court queried Juror No 6., who was seated as Prospective Juror No. 17:

"The Court: . . . Juror number 17.

"Prospective Juror No. 17:  My number is 1557.

"The Court:  Okay.

"Prospective Juror No. 17:  I live in Huntington Park, and I am single.  My occupation is house work.

"The Court:  Are there any other people living in your home?

"Prospective Juror No. 17:  Yes.

"The Court:  How many?

"Prospective Juror No. 17:  My mother.

"The Court:  What does mother do?

13

"Prospective Juror No. 17: She helps me sometimes do the house.

"The Court: She helps with other houses or your house?

"Prospective Juror No. 17: My house.

"The Court: Okay. [¶] Do you have any adult children?

"Prospective Juror No. 17: No.

"The Court: Have you ever served on a jury? Have you ever done this before?

"Prospective Juror No. 17: No, never.

"The Court: Thank you."

Neither the prosecutor, nor Osby, who was representing himself during voir dire,[6] challenged Prospective Juror No. 15, who was ultimately seated on the jury as Juror No. 7; nor did either party challenge the prospective jurors who were ultimately seated as Juror No. 6 and Juror No. 11.

### The Court's Initial Examination of Jurors No. 6, 7, and 11

Following the first morning of presentation of evidence, the court dismissed the jury for a lunch recess, with the

---

[6] Osby continued to represent himself through a portion of the trial, but was eventually replaced by stand by counsel. Stand by counsel was present in court during voir dire and during the period when Osby represented himself.

exception of Jurors No. 6, 7, and 11. The prosecutor remained in the courtroom, but Osby appears not to have been present.[7] The court then examined the jurors.[8]

"The Court: Jurors Number 6, 7 and 11. [¶] Juror Number 7, are you understanding? [¶] Look at me.

"Juror No. 7: Yes, she tell me to stay here.

"The Court: Are you understanding what is going on?

"Juror No. 7: No, not exactly that you say. As me no speaking English very well. Something I no understand well.

"The Court: You said that perfectly well. [¶] Juror Number 11, are you understanding?

"Juror No. 11: No, not much.

_____

[7] The record indicates that the other jurors left the courtroom, but it does not specifically state whether one or both of the parties remained. However, it can be inferred from later discussions that the prosecutor was present, but Osby was not.

[8] The trial court did not reveal what prompted it to examine the jurors, but later stated that the court had confidence that if Juror No. 7 were concerned about her ability to understand English, she would bring it to the court's attention "as she has in the past." We deduce from this statement that it is likely the jurors raised concerns with the court regarding their competence to serve as jurors due to their difficulties understanding the language, and that this prompted the court's examination of them. At a minimum, Juror No. 7 raised her concerns at some point in the proceedings.

"The Court:  What have you understood?

"Juror No. 11:  It's always basic.

"The Court:  Why are we here?

"Juror No. 11:  (No audible response)

"The Court:  Juror Number 6?

"Juror No. 6:  Sometimes I can not understand that word or words.

"The Court:  But you understand what is going on here, right?

"Juror No. 6:  A little.

"The Court:  Do you understand why you are here?

"Juror No. 6:  Yes, because I don't know how to say.

"The Court:  But you understand why you are here?

"Juror No. 6:  Yes.

"The Court:  Okay.  Thank you."

The court then released Jurors No. 6, 7, and 11 for the lunch recess.

## Hearing on the Jurors' Competency and Second Examination of Jurors No. 6, 7, and 11

Following the lunch recess, the court discussed its concerns with the parties outside the presence of the jury:

"The Court:  Mr. Osby, there's an issue with regards to three jurors having trouble understanding English.  [¶]  The court inquired of Juror Number 11 who indicates that she doesn't speak English.  Juror Number 7 who says she understands some, and explained to the court that she was

having trouble and said that pretty well, and Juror Number 6 said she's following along with difficulty. [¶] Do you wish to be heard?

"[Osby]: Yes, ma'am. [¶] I move to have the jury excluded and a new panel installed because too much evidence has already been heard. That issue should have been raised from the beginning.

"The Court: The People wish to be heard?

"[Prosecutor]: So just to be clear, I think that what the defendant is doing is making a motion for mistrial.

"My position would be that certainly there is -- I believe Juror Number 7, the court made a dutiful inquiry and received good and responsive answers to the court's questions that would convince -- that I think is convincing that the juror understands sufficiently what is happening in the courtroom to be able to participate on the jury.

"Juror Number 6 affirmed that she was following along with some difficulty. She perhaps was not as strong as Juror Number 7 in terms of her comprehension level, but she stopped short of saying she didn't understand what was going on in these proceedings.

"Juror Number 11 presents really the toughest challenge for the court because Juror Number 11 has now repeatedly asserted that she doesn't speak English and seems to be struggling when asked direct questions.[9]

---

[9] The record does not indicate how or when the juror communicated this concern "repeatedly" to the court, let alone how her communication was relayed to the prosecutor.

"So I think of the three, I suppose that would be the one that -- the only one that I think really presents a serious question based on the information that has been provided thus far.

"As far as if it were to be construed for a motion for mistrial, I don't think there's any reversible harm or error that has been done to the defendant at this point.

"If there is a question about a juror, the court has, I believe three alternates who are available.

[¶] . . . [¶]

"The Court: Okay. [¶] Anything else?

"[Prosecutor]: No, thank you.

"The Court: Thank you. [¶] Your request for mistrial is denied.

"[Osby]: Your Honor, I feel that the defense has a right to speak on the issue in rebuttal to what the prosecution is stating, Your Honor.

"The Court: No, you don't. [¶] I've heard your argument. I've heard your position. I don't need to hear any more. The court is going to release Juror Number 11. The court is going to keep jurors --

"[Osby]: The court --

"The Court: Don't speak over me, Mr. Osby.

"[Osby]: (Inaudible response)

"The Court: Juror Number 11 will be excused. . . .

"[Osby]: You allowed the District Attorney to assess the collateral damage."

The court did not respond to Osby. The court continued its ruling, stating that it would excuse Juror No. 11 and seat Alternate No. 1 in that juror's place.

"[Osby]: I would like to object. [¶] The prosecution is speaking of a hearing the defense is not present at.

"The Court: Bring in Jurors 6, 7 and 11, please.

"[Osby]: I am asking, was that hearing done?

"The Court: I am going to do that with you now."

The court advised Osby that he was not to speak unless the court asked him to. Osby argued with the court, and the court responded that if he continued to argue the court would revoke his pro per status. The court then questioned each of the three jurors separately.

"The Court: Juror Number 7, Juror Number 7, do you understand the proceedings that we are in? [¶] Look at me.

"Juror No. 7: No very well, but --

"The Court: But you keep talking to me in English perfectly well. [¶] Are you understanding what the witnesses are saying?

"Juror No. 7: Yeah, sometime I no understand things, but I will try.

"The Court: Thank you. [¶] Wait outside. [¶] Juror Number 6, are you understanding the proceedings?

"Juror No. 6: Sometimes I don't understand some words.

"The Court: Okay. [¶] That is all right. Some words, I understand that, but you understand what the witnesses are talking about?

19

"Juror No. 6:  Yes.

"The Court:  Okay.  Thank you.  [¶]  Wait outside.  [¶] Juror Number 11, are you understanding the proceedings?

"Juror No. 11:  I not 100 percent understand, only 20 percent.

"The Court:  20 percent?

"Juror No. 11:  I don't remember, yeah.

"The Court:  Are you understanding what the witnesses are saying?

"Juror No. 11:  No.

"The Court:  Okay.  Thank you.  [¶]  Wait outside.

"Jurors 6, 7 and 11 have been present before the court.

"It is this court's opinion that Juror Number 6 does understand --

"I am sorry, Juror Number 7 does understand.  She speaks well.  Her English, I think it is just a standard dilemma of some words that are not being captured, but that would happen in everyday language as well.

"Juror Number 7 is similar --

"Strike that, Juror Number 6 is similar to Juror Number 7, and they seem to understand why they are here. Maybe they will miss a few words every now and then, but that would happen in ordinary language as well, and I think we have to be just a little bit louder so they can hear better.

"Further, Juror Number 11 is the one causing the court concern about understanding proceedings."

The court asked if the parties wished to be heard.  The prosecutor submitted.  Osby stated, "The defense objects and

moves for mistrial." The court denied the motion for mistrial, excused Juror No. 11, and substituted Alternate No. 1 in Juror No. 11's place.

## Defense Counsel's Objection to Juror No. 7

Shortly after the prosecution completed its case-in-chief, the trial court revoked Osby's pro per privileges and appointed standby counsel to represent him.

After the court instructed the jury, defense counsel raised concerns regarding Juror No. 7's English proficiency:

"[Defense Counsel:] . . . Juror Number 7, when the court was talking, she's trying, she's so trying to understand.

"Your honor, I still don't believe that even with the court's inquiry of Juror Number 7 and what her replies, that she is able, and the court knows the law, it says that if a juror is unable to perform their duties, should be substituted in for an alternate juror.

"I just don't think she still can understand, and I saw her listening to the court when the court was talking about who has the burden.

"Her expressions and the way she was hanging or trying to hang on the court's words, seemed to me that she couldn't understand, and I will submit.

"The Court: [Prosecutor.]

"[Prosecutor]: Well, she does have a habit of sort of squirreling up her face and looking baffled and confused, but every time the court has inquired of her, she has handled

21

herself pretty well in the conversation, and I suspect that whatever her comprehension level is, it is probably sufficient that when she's allowed to have the give and take of discussing this -- the case with her fellow jurors, my guess is that we'll be able to address whatever level of misunderstanding or lack of understanding that she may have as to particular words that may be used or particular --

"I mean, here's the problem we have, I mean, our typical juror does not have -- does not necessarily have a college degree or a vocabulary that would allow them to understand all the words that are used in the jury instructions, and even those that have college degrees and have some understanding of advanced grammar struggle with the concept of reasonable doubt because it is something that everyone struggles with to one degree or another.

"So I guess it's all a long-winded way, and I apologize for that, of just saying I am not sure we have a basis for us substituting her out.

"The Court: Just so the record is also clear, her telephone went off earlier, her cell phone, and I indicated to her, 'Did you turn it off?'

"She said, 'Yes, I did.'

"She understood that perfectly clearly,[10] and I think it is just the daily language that she does understand, and that

---

[10] The conversation to which the trial court was referring took place during defense counsel's direct examination of Menjivar, and consisted entirely of the following:

22

is why we give them the instructions in the back when they deliberate.

"The true test will be in deliberations and if the foreperson takes this job as appropriately, they will advise us, and I am sure that she will probably speak up if she feels she's not capable as she has in the past."[11]

### *Legal Principles*

Pursuant to section 1089, a trial court may discharge a juror at any time during trial if the court finds that the juror is "unable to perform his or her duty." "'Insufficient command of the English language to allow full understanding of the words employed in instructions and full participation in deliberations clearly . . . render[s] a

---

"The Court: Just one second. [¶] Juror Number 7, did you turn it off? [¶] "The Juror 7: Yes."

[11] The court had previously advised the jury that "[t]he foreperson should see to it that your discussions are carried on in an organized way and that everyone has a fair chance to be heard. [¶] It is your duty to talk with one another and deliberate in the jury room." "If you need to communicate with me while you are deliberating, send a note through the bailiff, signed by the foreperson or by one or more members of the jury." The court did not amplify the instruction or address the jury regarding the procedure to follow if a juror had concerns about that juror's own ability to understand the English language proceedings or about a fellow juror's ability.

23

juror "unable to perform his duty" within the meaning of Penal Code section 1089.'" (*People v. Lomax* (2010) 49 Cal.4th 530, 566 (*Lomax*), quoting *People v. Elam* (2001) 91 Cal.App.4th 298, 316; Code Civ. Proc., § 203, subd. (a)(6) [to be eligible and qualified to serve as juror, a person must be "possessed of sufficient knowledge of the English language"].) "Limiting jury service to those who are 'possessed of sufficient knowledge of the English language' [citation] . . . serves 'a significant state interest' [citation] in ensuring the uniform and efficient administration of the justice system and avoiding possible translation distortions." (*People v. Eubanks* (2011) 53 Cal.4th 110, 131.)

"'The decision whether to investigate the possibility of juror . . . incompetence . . . rests within the sound discretion of the trial court. [Citation.] . . . [¶] As our cases make clear, a hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case. [Citation.]' (*People v. Ray* (1996) 13 Cal.4th 313, 343.)" (*People v. Cleveland* (2001) 25 Cal.4th 466, 478 (*Cleveland*).) "Once the court is alerted to the possibility that a juror cannot properly perform his duty . . . it is obligated to make reasonable inquiry into the factual explanation for that possibility." (*People v. McNeal* (1979) 90 Cal.App.3d 830, 838 (*McNeal*).)

We review for abuse of discretion a trial court's ruling whether to discharge a juror for good cause under section 1089. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1158

24

(*Guerra*), overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) However, "such review involves a 'heightened standard [that] more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.'" (*People v. Armstrong* (2016) 1 Cal.5th 432, 450 (*Armstrong*), quoting *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 (*Barnwell*).) "Specifically, the juror's 'inability to perform' his or her duty 'must appear in the record as a demonstrable reality.' [Citations.]" (*Armstrong, supra,* at p. 450.)

"Under the demonstrable reality standard, a reviewing court's task is more 'than simply determining whether any substantial evidence in the record supports the trial court's decision.' (*People v. Lomax*[, *supra,*] 49 Cal.4th [at p.] 589.) 'A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied. . . . [¶] The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror is] established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's

25

conclusion is manifestly supported by evidence on which the court actually relied.  [¶]  In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides.'  (*Barnwell*, *supra*, 41 Cal.4th at pp. 1052–1053, citation omitted.)" (*Armstrong*, *supra*, 1 Cal.5th at pp. 450–451.)

"'If a juror's responses are conflicting or equivocal, the trial court's ruling is binding on us.  [Citations.]  If not, we will uphold the trial court if the ruling is fairly supported by substantial evidence in the record, giving deference to the trial court which had the opportunity to observe and listen to the juror.  [Citations.]'  (*People v. Holt* (1997) 15 Cal.4th 619, 651.)"  (*Lomax*, *supra*, 49 Cal.4th at p. 567.)

*Analysis*

### The Trial Court Abused its Discretion by Failing to Make a Reasonable Inquiry into Juror No. 7's Competency

Here, the trial court determined Jurors No. 6, 7, and 11 demonstrated potential language problems not revealed during voir dire, which, if proven to be true, would constitute good cause to doubt their abilities to perform their duties and would justify their removal.  Having been alerted to the possibility that the jurors may not have been capable of discharging their duties, the trial court was obligated to "make reasonable inquiry into the factual explanation for

26

that possibility."[12]  (*McNeal, supra*, 90 Cal.App.3d at p. 838.) Although the trial court examined Juror No. 7 regarding her English competency, that examination was far from what we would deem a "reasonable inquiry" under the circumstances. In the court's first examination, the court asked Juror No. 7 two vague questions:  "[A]re you understanding?" and "Are you understanding what is going on?"  Juror No. 7's response that she was told to "stay" suggests that she believed the court was asking if she understood what was happening at that moment (i.e., why she and two fellow jurors were held into the lunch recess to talk with the judge), and not if she understood the trial proceedings and witness testimony. When the court pressed further, Juror No. 7 admitted in broken English, "No, not exactly that you say.  As me no speaking English very well.  Something I no understand well."  The only facts this examination revealed were that Juror No. 7 did not understand what the trial court was asking her, and did not believe that she understood English well.

---

[12] We do not suggest that a hearing is required every time a juror expresses concern regarding their English language proficiency.  (See *Cleveland, supra*, 25 Cal.4th at p. 478 [a hearing is only required if good cause exists to justify a juror's removal from the case].)  We understand that there are occasions in which a juror will exaggerate a lack of comprehension to evade jury service.  A trial court that is confident in a juror's ability to understand English based on his or her responses to questioning and/or demeanor in voir dire may forego further inquiry.

27

After Osby complained that he had not been present when Juror No. 7 was examined, the trial court examined Juror No. 7 a second time and asked another two questions. This time the court was more precise—"[D]o you understand the proceedings that we are in?" "Are you understanding what the witnesses are saying?" Juror No. 7's responses were still not reassuring, however. With respect to her understanding of the proceedings, she indicated her understanding was "[n]o very well, but--" With respect to whether she understood the witnesses she said, "[y]eah, sometime I no understand things, but I will try."

We are cognizant that "[t]he trial court retains discretion about what procedures to employ, including conducting a hearing or detailed inquiry, when determining whether to discharge a juror." (*Guerra*, *supra*, 37 Cal.4th at p. 1159.) Here, however, it is clear on the face of the record that the trial court's efforts to ascertain whether Juror No. 7 understood the proceedings and testimony were minimal and ineffective. The court failed to ask even the most basic questions that would have allowed it to satisfactorily assess Juror No. 7's English proficiency. The court did not ask how long Juror No. 7 had been speaking English, if she had any education in English, if she could read English, or how much exposure she had to English on a daily basis, in her home, work, or elsewhere. The court did not inquire as to whether Juror No. 7 believed that she could faithfully discharge her duties as a juror.

By listing these examples, we do not mean to imply that a trial court must ask a certain number of questions or even a specific question. An inquiry need not be extended or exhaustive, but it must shed enough light on the issue before the court to provide a basis for the court's ruling. The record developed by the court's inquiry here does not support the court's decision to allow Juror No. 7 to continue. Instead, the record shows that, after listening to the morning's testimony, Juror No. 7 was concerned about her lack of proficiency in English. Despite the concern, the court inquired of her only to the point where Juror No. 7 stated she would "try," indicating she would make an effort to understand, not that she could understand the proceedings. Beyond the unsatisfactory answers given by the juror, the trial court did not develop or note any evidence on the record about Juror No. 7's demeanor, from which English language proficiency could be inferred.

The inadequacy of the trial court's inquiry became even more apparent when Osby's counsel again raised the issue of Juror No. 7's English language proficiency at the time the court was instructing the jury. By that point in the trial, both parties noted that the juror's demeanor suggested language difficulties (defense counsel commenting that "[h]er expressions and the way she was hanging or trying to hang on the court's words, seemed to me that she couldn't understand," and the prosecutor observing, "she does have a habit of sort of squirreling up her face and looking baffled and confused"). The prosecutor even suggested that any lack

of understanding would be remedied by interacting with other jurors in deliberations.  Notably, the trial court did not mention or rely on its prior inquiries of Juror No. 7 as establishing the juror's proficiency; rather, the trial court expressed the belief that the "true test" of Juror No. 7's competency would come during the jury's deliberations.  We view the court's statement that it would learn of any language deficiencies that Juror No. 7 might have from the juror or the foreperson during deliberations as an implicit acknowledgement that the court's prior inquiry into the juror's understanding was inconclusive, at best.  Responsibility for inquiring into potential juror incompetence lies with the court, and cannot be delegated to members of the jury.  The court's failure to conduct a reasonable inquiry into the extent of Juror No. 7's English proficiency when faced with the clear possibility that Juror No. 7 might not be competent to fulfill her duty was an abuse of discretion.

"An evaluation of whether the error was prejudicial must have as its foundation the defendant's right to a jury trial by a fair and impartial jury, as provided by the California Constitution, article I, section 16." (*McNeal*, *supra*, 90 Cal.App.3d at p. 840.)  In *McNeal*, the Court of Appeal, First District, Division Three held that "where the fact a of sworn juror's impartiality comes into question as a result of that juror's conduct or statements during the course of the trial or the deliberations, the failure of the court to make at least a preliminary inquiry into the facts of such

30

impartiality cannot be said to be error harmless beyond a reasonable doubt." (*Ibid*.)  In this case, there has been no showing of impartiality or bias, but our case law is clear that an insufficient command of the English language to allow a juror to fully understand instructions and participate clearly in deliberations renders that juror equally unsuitable to serve.  The trial court recognized there was a possibility that Juror No. 7 could be incompetent and conducted two examinations of her.  Those examinations did not produce a satisfactory record for the trial court to determine whether Juror No. 7's understanding of English was sufficient.  In such a case, as when a juror's impartiality comes into question, "the court's failure to make an appropriate inquiry into the facts in order to determine whether they constituted good cause for discharge of the juror constitutes reversible error." (*Ibid*.)

### **The Trial Court Abused its Discretion When It Determined that Juror No. 7 Had Sufficient Command of English to Serve as a Juror**

Even assuming that the inadequacy of the trial court's investigation does not constitute grounds for reversal, we nevertheless conclude that the trial court's decision to retain Juror No. 7 based upon the information before it was an abuse of discretion.  The trial court's reasoning is sparse. When the court denied Osby's objection and motion for mistrial, it said of Juror No. 7:  "Juror Number 7 does

31

understand.  She speaks well.  Her English, I think it is just a standard dilemma of some words that are not being captured, but that would happen in everyday language as well."  The trial court did not state specifically *what* she thought Juror No. 7 said well, but from her earlier comments—"[y]ou said that perfectly well" and "you keep talking to me in English perfectly well"—we can only surmise that the court was referring to Juror No. 7's statements during the two examinations, in which the juror explained, in broken English, that she did not fully understand what was going on.  ("[M]e no speaking English very well.  Something I no understand well."  "No very well . . . .")  The court added that Jurors No. 6 and 7 "seem to understand why they are here."  The basis for this conclusion is also unclear.

Later, when defense counsel moved to have Juror No. 7 removed due to his concerns that she did not comprehend the proceedings, the court again declined.  At that time, the court noted that, after Juror No. 7's cell phone rang in open court and the court asked if she turned it off, Juror No. 7 responded "yes."  The court observed that "[s]he understood that perfectly clearly."

The court opined that the juror understood only "daily language," but that any problems would be remedied by providing the jurors with written instructions.  The court then placed the burden of raising any future concerns regarding the Juror No. 7's competency on Juror No. 7 and the foreperson (who were never alerted that this

responsibility rested with them), stating that whether one of them spoke up would be "the true test" of Juror No. 7's English proficiency.

Heeding the "heightened standard[, which] . . . reflects [our] obligation to protect a defendant's fundamental rights to due process and to a fair trial" (*Barnwell*, *supra*, 41 Cal.4th at p. 1052), we are not "confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied" (*Id*. at p. 1053). Juror No. 7 did not speak "perfectly well" when questioned, and, more importantly, she expressed repeatedly that she did not fully understand the proceedings that she had just observed.

We cannot conclude that Juror No. 7's ability to respond "yes" after being asked if she turned her cell phone off is substantial evidence that she had sufficient understanding of English to comprehend instructions and participate in deliberations. In the context of having just silenced her phone after it interrupted proceedings, it did not take more than a minimal understanding of English to recognize that when the court identified her by her juror number (as it had many times), and uttered the word "off," she should respond "yes."

With respect to the court's comment that Juror No. 7 seemed to know why she was in court, we fail to see the relevance. The court summons that Juror No. 7 received would have indicated the purpose of her coming to court, and could have been translated for her. She was not limited in the resources she could employ to translate the summons,

33

whereas she would only be permitted to use her own knowledge of English to understand witness testimony, instructions, and deliberations. A general awareness of why she was present in court was not necessarily indicative of her level of understanding of English or the specific proceedings.

On appeal, the People rely heavily on Juror No. 7's statements in voir dire, but neither of the parties argued to the trial court that her voir dire responses were a basis for retaining or excusing her, and the trial court did not rely on those statements in determining to retain Juror No. 7. Voir dire was complete when the language problems of the three empaneled jurors first surfaced and were brought to the trial court's attention. The fact that the trial court never mentioned or relied on its conversations with these jurors in voir dire to establish their proficiency indicates that the court did not believe that voir dire adequately explored the potential problem of Juror No. 7's inability to fully understand the trial testimony and instructions. We find it significant that Juror No. 11 had also completed voir dire without challenges, but the trial court nevertheless determined mid-trial that she was not competent to continue serving given her responses in the court's two later examinations, which were very similar to Juror No. 7's responses.

Even considering the trial court's ruling in light of the record as a whole, voir dire did not illuminate the problem, nor did it contradict Juror No. 7's assertion that she did not

34

understand English well. The People argue that in voir dire Juror No. 7 "was able to answer all the court's questions with no problem and indicated that she had served on jury in a criminal case that did not reach a verdict." This characterization does not paint the full picture. In voir dire, Juror No. 7 was asked only basic questions about herself and her family, the vast majority of which were questions that one would expect to find in the front pages of a basic English phrase book. The trial court posed these same questions to the 14 prospective jurors it queried before questioning Juror No. 7, who was then seated as Prospective Juror No. 15. Juror No. 7 therefore had the benefit of listening to the questions and answers over and over before she was questioned herself. Despite this, Juror No. 7 did not always understand the questions the court posed to her, until the court rephrased them for her. For example, when the court asked what part of the city Juror No. 7 lived in, she first answered "L.A." despite the fact that the court had instructed that it wanted to know which neighborhood each of the jurors lived in, and the jurors questioned ahead of Juror No. 7 had answered this question appropriately. When asked if she had served on a jury, Juror No. 7 indicated that she was "coming only two days," it was "criminal" and there was "no verdict." She did not state that she had been chosen to serve on the jury or that she had participated in voir dire, as the People imply. The court had advised the jury that "[c]oming to court is serving." Juror

35

No. 11, who the court excused, had also indicated that she had "served" on a jury, "maybe 2 years ago."

Viewing the record as a whole, and considering in particular the reasons for the trial court's ruling, we conclude that Juror No. 7's inability to perform appears as a demonstrable reality, and the trial court's determination to retain Juror No. 7 was an abuse of discretion. The trial court did not state reasons for its ruling that are supported by substantial evidence in the record, and absent such reasons it is not appropriate to defer to the trial court's judgment. Juror No. 7 expressed significant concerns about her ability multiple times. The trial court did not indicate that it did not believe her statements, but instead held up her responses in broken English as evidence that she could understand the language sufficiently and "speak well." The court ultimately stated that it would rely on Juror No. 7 and the foreperson to bring the issue to the court's attention if Juror No. 7 could not competently serve on the jury. This was not a proper exercise of the trial court's discretion.

Osby contends that the failure to discharge Juror No. 7 requires reversal of the judgment, citing to *People v. Szymanski* (2003) 109 Cal.App.4th 1126 (*Szymanski*). In *Szymanski*, a juror expressed concern during voir dire about her ability to understand English. The juror, who was from China, spoke mainly Chinese both at home and work and responded to the court's questions during voir dire in broken English, often with "unintelligible" answers. (*Id.* at pp. 1131–1132.) The defendant had already exhausted his

peremptory challenges, and the trial court refused the requests of both the prosecutor and defense counsel to excuse the juror for cause, reasoning that any language difficulties could be resolved by allowing the juror to ask questions if she did not understand something. The Court of Appeal held that, under those circumstances, the trial court's refusal to dismiss the juror denied the defendant his right to a qualified jury. (*Id.* at p. 1132.)

The People attempt to distinguish *Szymanski* on the ground that here, neither Osby nor the prosecutor challenged Juror No. 7's inclusion in the jury at voir dire. The People emphasize that in *Szymanski*, the appellate court held that the defendant's right to a qualified jury was violated and reversal was required because the defendant had exhausted all of his peremptory challenges and was left without any recourse for the juror's removal—he was literally forced to accept a juror that the parties agreed was incompetent.

We do not see the timing of Osby's objection to keeping Juror No. 7, which occurred after the completion of voir dire, as leading to a different result. Osby, when self-represented, and later his counsel, did all that they could to object to Juror No. 7 remaining on the jury once the juror's English language proficiency appeared problematic.[13] Osby was

_____

[13] It is of no significance that no further problems with Juror No. 7's language ability were raised during jury deliberations, after trial court indicated that it expected Juror No. 7 or the foreperson to bring problems to the court's

37

effectively placed in the same position as Szymanski. He was forced to accept a juror whose command of the English language was not sufficient to permit her to fully comprehend the testimony and instructions or to deliberate with her fellow jurors, through no fault of Osby's own or lack of effort on his part.[14] The error requires reversal.

---

attention. Even if Juror No. 7 did have concerns, she may not have brought them to the court, given that she had already been questioned twice and left on the jury, with the court complimenting her English. Nor is there any reason to think that the foreperson or other jurors would necessarily identify that the juror was not understanding witnesses, instructions, or deliberations; it is entirely plausible that the juror quietly sided with her fellow jurors.

[14] Although it is not a basis for our ruling, we note that in this case, the stakes were quite high for Osby. The jury was instructed on the lesser offense of petty theft in addition to robbery. The difference between those two crimes rested on whether Osby employed force or fear to take the toilet paper. It was undisputed that he did not employ force or fear when he initially took the toilet paper from the store and rode away. The question for the jury was whether the fight that occurred after Menjivar told Osby to give him the toilet paper and Osby threw it on the ground constituted a taking by force or fear. The difference is a subtle one, requiring a full understanding of the testimony and the instructions. Had the jury convicted Osby of petty theft he would have been facing at most a sentence of a few years, not life.

## DISPOSITION

The judgment is reversed in its entirety.  Retrial of the case is not barred by the double jeopardy clauses of the state and federal Constitutions.  (See *People v. Hernandez* (2003) 30 Cal.4th 1, 6 [no double jeopardy bar to retrial of the case where reversal based on court's erroneous removal of juror for bias]; *Armstrong, supra*, 1 Cal.5th at p. 454 [no double jeopardy bar to retrial of the case where reversal based on court's erroneous removal of juror for failure to deliberate].)


MOOR, J.

I concur:


RUBIN, P. J.

The People v. David Osby
B299496


BAKER, J., Concurring


I agree we have no choice but to reverse the judgment, though for a different reason than the one the majority gives.

When trial of defendant David Osby (defendant) first began, his attorney expressed a doubt about his competence, the proceedings were halted, defendant was evaluated, and the evaluator concluded he was not competent to stand trial. The trial court referred defendant for treatment at Metropolitan State Hospital and, after weeks of treatment, hospital staff opined he was competent to stand trial while taking psychotropic medication.

Defendant was returned to court, and the trial court restarted criminal proceedings. Defendant then asked to represent himself and the trial court granted the request without any further competence inquiry or expression of doubt about whether he was competent to perform the task. That itself is a problem. The hospital personnel rendered their competency determination using the *Dusky v. United States* (1960) 362 U.S. 402 standard, namely, that defendant had a rational and factual understanding of the criminal proceedings and a sufficient then-existing ability to consult with counsel with a reasonable degree of rational understanding. But competence to represent oneself is measured by a different standard (*Indiana v. Edwards* (2008) 554 U.S. 164, 170, 174-175, 178), and there was no opinion

evidence from mental health professionals before the trial court evaluating whether defendant suffered from severe mental illness to the point where he would not be competent to conduct trial proceedings by himself.

Once trial was underway, the problem—defendant's difficulties in competently conducting trial proceedings by himself—only became more apparent and yet the trial court still did not promptly declare a doubt about his competence to represent himself. Instead, it was not until five days into trial that the court revoked defendant's self-represented status (for interrupting and delaying the proceedings and aggressive behavior); by then, the damage was already done. The failure to declare a doubt about defendant's competence to represent himself is prejudicial error. (See *People v. Murdoch* (2011) 194 Cal.App.4th 230, 238-239; see also *People v. Mendoza* (2016) 62 Cal.4th 856, 884 ["'[W]hen a competency hearing has already been held and the defendant has been found competent . . . a trial court need not suspend proceedings to conduct a second competency hearing *unless it "is presented with a substantial change of circumstances* or with new evidence" casting a serious doubt on the validity of that finding'"], italics added.)

I would reverse and remand to permit the trial court to determine, in the first instance, whether the People can make the difficult and rare showing that a retrospective assessment of defendant's competence is possible (see, e.g., *People v. Lightsey* (2012) 54 Cal.4th 668, 709-710) and, if not, for retrial—if defendant is at that time competent.


BAKER, J.


2