Filed 10/19/22  P. v. Baylon CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074444 |
| v. | (Super.Ct.No. INF1501718) |
| ANDRES BENJAMIN BAYLON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  James T. Latting, Judge. Affirmed in part, reversed in part and remanded with directions.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Charles C. Ragland, Assistant Attorneys General, Steve Oetting, Warren Williams and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Defendant and appellant Andres Benjamin Baylon was convicted of attempted murder and other crimes stemming from a gang motivated home invasion. On appeal, he contends that the trial court failed to investigate whether a juror should be discharged, that it failed to adequately investigate whether a potential juror's comments caused the venire to be biased, and that it misapplied Penal Code section 654. He also contends that two recently enacted laws entitle him to relief: Assembly Bill No. 333 (2021-2022 Reg. Session) (Assembly Bill 333), which narrowed the applicability of enhancements for offenses involving a criminal street gang, and Senate Bill No. 567 (2021-2022 Reg. Session) (Senate Bill 567), which among other things reduced a trial court's discretion in imposing an upper term at sentencing.

We find no error by the trial court. We agree with Baylon, however, that he is entitled to the benefits of both new laws. We therefore reverse the gang enhancements and vacate the sentence, remand to allow the People an opportunity for a partial retrial on the gang enhancements (followed by resentencing under the law as amended), and otherwise affirm the judgment.[1]

## I. BACKGROUND

One night in 2015, Diana Cruz was sleeping in her living room when Mario Sanchez woke her up. Sanchez struck Cruz on the head with a pistol, and when Cruz stood up, Sanchez struck her with the pistol again.

---

[1] Undesignated statutory references are to the Penal Code.

2

Stephen Aguirre, Cruz's boyfriend, was sleeping in the bedroom. He opened the door and saw Sanchez along with Baylon in the living room. Aguirre knew the two, as in the past Sanchez and Baylon would sometimes go to Aguirre's house to "kick[] back" and smoke marijuana. Aguirre had also sold them marijuana on occasion. Aguirre knew Sanchez to be a member of the VIR gang.

Sanchez demanded that Aguirre hand over marijuana and money. Aguirre resisted, and Baylon shot Aguirre in the chest. Aguirre turned to reach for a baseball bat and was shot again. Sanchez grabbed Aguirre and told him: "This is what you get for dealing with our enemies from . . . nut sack . . . Campo-rachas . . . and booya town."[2] Aguirre understood this to mean that he "had no business selling to their enemies." Sanchez then struck Aguirre in the head with a pistol. Baylon and Sanchez took marijuana, a cell phone, and $100 from Aguirre and Cruz. They also demanded and took cell phones from a couple sleeping inside another bedroom in the house.

Baylon was charged with Aguirre's attempted murder (§§ 664, 187, subd. (a), count 1), Aguirre's robbery (§ 211, count 2), Cruz's assault with a firearm (§ 245, subd. (a)(2), count 3), and burglary (§ 459, count 4).[3] For all four charges, the People alleged

---

[2] Aguirre explained at trial that the terms referred to "North Side," "farm labor camp," and "Coachella 52 and 53" respectively, which were other gangs.

[3] Sanchez was charged with the same substantive crimes, and the two were tried together. However, because this appeal concerns only Baylon, we do not detail Sanchez's specific charges here, nor do we describe any additional information about Sanchez except as context requires.

3

that Baylon committed the offense for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)) and that he personally used a firearm (§ 12022.5, subd. (a)). For the attempted murder, robbery, and burglary charges, the People also alleged that Baylon used a firearm in a manner described in section 12022, subdivision (a)(1), and section 12022.53, subdivisions (b) through (e). The People additionally alleged that Baylon suffered two prior prison convictions (§ 667.5).[4]

After the first week of trial, Baylon's attorney underwent emergency surgery, causing an approximately two-month break before trial resumed. During the trial, an expert witness on criminal street gangs opined that Baylon was an active VIR member at the time of the attempted murder. Baylon's defense focused on misidentification.

The jury convicted Baylon on all charges and found all enhancement allegations true. The trial court sentenced Baylon to a determinate term of 25 years followed by an indeterminate term of 57 years to life.

## II. DISCUSSION

### A. Alleged Juror Inattentiveness

Before the approximately two-month break in trial, an alternate juror (who ultimately sat on the jury) expressed a preference for continuing right away or restarting the trial later, stating that he hadn't "been taking any notes or anything." Baylon

---

[4] A number of these enhancements were later dismissed or struck. During trial, the court granted the People's motion to dismiss the section 12022.5, subdivision (a) enhancements as to count 3. At sentencing, the trial court struck the section 12022.53 enhancements as to count 4 as well as the prison priors.

contends that the trial court should have inquired about the alternate juror's alleged inattention to determine whether the alternate juror should have been excused. We disagree.

*1. Additional Background*

After the first week of trial in August 2019, Baylon's attorney underwent emergency surgery. On the next day of trial, another attorney specially appeared on Baylon's attorney's behalf, informed the court of the emergency surgery, and requested that trial resume in approximately two months. The trial court brought in the jury—twelve jurors and three alternates at the time—and asked whether resuming the trial in a couple of months "might be possible." A few jurors noted scheduling difficulties with postponing the trial.

Alternate Juror 2, whose comments are the subject of this issue on appeal, expressed concerns about the two-month gap. The following exchange took place:

"[Court]: Okay. Who else raised their hand?

"[Alternate Juror 2]: I can wait until November, but I haven't been taking any notes or anything. So if I have to wait two months—but if we have to, like, remember everything. It's been a week. We've heard a few people witness already. [¶] In my opinion, it would be better if we can just continue. And if we have to restart I would rather do that. I don't know if that's an option.

"[Court]: I see. As opposed to continue the trial from where we are now is what you're saying.

5

"[Alternate Juror 2]: Correct. If we could just continue and get it over with now, that would be best for me.

"[Court]: I'm sorry. If we could?

"[Alternate Juror 2]: If we have to restart and just continue, you know, tomorrow.

"[Court]: That's not possible. That's our problem. We don't have an attorney who can take over tomorrow. So that's where we find ourselves. [¶] And who else? Yes."

Later on, outside the presence of the jurors, the court continued to consult with the parties about the extended continuance. Sanchez's counsel raised a concern about Alternate Juror 2:

"[Sanchez's Counsel]: I'm a little bit concerned about the alternate, the young man, that he may not be that invested. That's why I would like [Juror] 1 to come back and give us an update [in approximately 2 months].[5]

"[Court]: Alternate [Juror] 2 is kind of on the record saying that he hasn't been paying attention.

"[Sanchez's Counsel]: I didn't write anything down.

"[Court]: And then we're going to ask him to wait.

"[Prosecutor]: Well, we have to call it what it is. That's what he said.

---

**5**    Juror 1 had informed the court that she would be moving at the end of November and would be responsible for training her job successor before then.

"[Court]: And we are going to ask him to wait over two months. And he will be—if what Juror Number 1 tells us is accurate, he'll be one of the 12. So that's an issue. Well, the other benefit is he's young and he has a better memory than most of it [*sic*]."

The court dismissed two jurors and ordered the remaining jurors to return in November. A third juror, Juror 1, was excused before trial resumed in November. The three alternate jurors, including Alternate Juror 2, were seated as jurors when trial resumed. None of the parties objected to Alternate Juror 2 being seated or requested further inquiry from the court.

### 2. *Applicable Law and Discussion*

"'[A] trial court may discharge a juror who "becomes ill, or upon other good cause shown to the court is found to be unable to perform his [or her] duty, . . ." (§ 1089, 5th par.) Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty to "make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged.'" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1348 (*Bradford*).) "Grounds for investigation or discharge of a juror may be established by his statements." (*People v. Keenan* (1988) 46 Cal.3d 478, 532.)

"'"The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial."'" [Citation.] A hearing is required only where the court possesses

7

information which, if proved to be true, would constitute 'good cause' to doubt a juror's ability to perform his or her duties and would justify his or her removal from the case." (*Bradford*, *supra*, 15 Cal.4th at p. 1348.)

Not all claims of juror behavior merit investigation. For example, "'the mere suggestion of juror "inattention" does not require a formal hearing disrupting the trial of a case.'" (*Bradford*, *supra*, 15 Cal.4th at p. 1348.) Similarly, a "defense counsel's speculation that a juror might have been sleeping [is] insufficient to apprise the trial court that good cause might exist to discharge the juror." (*Ibid.*; *People v. Espinoza* (1992) 3 Cal.4th 806, 821.)

Even claims that go beyond speculation do not necessarily require investigation. In *Bradford*, our Supreme Court declined to find an abuse of discretion in a trial court's refusal to conduct an inquiry where "the record reveal[ed] no more than that the juror had fallen asleep on the day in question and appear[ed] to have been asleep one day earlier; it [did] not appear that the juror continued to fall asleep or had been asleep for a longer period of time." (*Bradford*, *supra*, 15 Cal.4th at pp. 1348-1349.)

At the outset, we decline to hold that Baylon has forfeited the issue by failing to raise a challenge when Alternate Juror 2 was seated on the jury. In the interest of judicial economy, we will address the argument on the merits. (See *People v. Williams* (2000) 78 Cal.App.4th 1118, 1126 [addressing on appeal issue that would otherwise be forfeited to "forestall a petition for writ of habeas corpus based on a claim of ineffectual counsel"].)

Alternate Juror 2's statements were not enough to show that good cause might have existed. He stated that he had not "been taking any notes," voiced a generalized concern at having to "remember everything" for two months, and expressed a preference for continuing with the trial "tomorrow." These statements would not have required further investigation.

For one, there is no requirement that jurors take notes. (See Cal. Rules of Court, rule 2.1031 ["At the beginning of a trial, a trial judge must inform jurors that they *may* take written notes during the trial."], italics added; CALCRIM No. 202.) And here, the trial court instructed the jury that *not* taking notes may have been beneficial. As the court instructed the jury prior to the start of trial: "I do not mean to discourage you from taking notes, but there are some points to consider if you take notes: [¶] 1. Note-taking may tend to distract you. It may affect your ability to listen carefully to all the testimony and to watch the witnesses as they testify; [¶] AND [¶] 2. The notes are for your own individual use to help you remember what happened during the trial. Please keep in mind that your notes may be inaccurate or incomplete." Whether or not Alternate Juror 2's decision to not take notes was influenced by these instructions, the fact that he was not taking notes was not, in itself, a cause for concern.

For another, Alternate Juror 2's concerns about remembering a week's worth of trial testimony for approximately two months were hardly unreasonable. Fortunately, other methods of recalling information presented at trial were available, and— significantly here—the record shows that the jury both was aware of them and utilized

9

them.  The jury was instructed, for instance, that "you may ask that the court reporter's record be read to you," and it asked and received readbacks of the record twice during its deliberations.  In sum, we find nothing in the record that would have obligated the trial court to investigate further.

Baylon's arguments to the contrary are unconvincing.  He emphasizes, for example, the fact that the trial court characterized Alternate Juror 2 as inattentive when it stated that he was "kind of on the record saying that he hasn't been paying attention." This statement, however, does not suggest that the trial court needed to investigate further, as it both appears unsupported by Alternate Juror 2's actual statements and is qualified by the phrase "kind of."  In the absence of any additional statements made on the record about his demeanor, we decline to infer that additional grounds supported the trial court's characterization of Alternate Juror 2.  (Cf. *Snyder v. Louisiana* (2008) 552 U.S. 472, 479 [as to claim of inappropriate discrimination in use of peremptory challenge, reviewing court will not credit juror demeanor as reason for strike where trial court made no "specific finding on the record concerning [the juror's] demeanor"].)

Similarly, Baylon relies on inapposite cases.  In *People v. Burgener* (1986) 41 Cal.3d 505 (*Burgener*), disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 753-754, our Supreme Court held that the failure to investigate claims by the jury foreman that another juror was "obvious[ly]" intoxicated during deliberations, supported in part by reports that other jurors smelled marijuana on the intoxicated juror, was error.  (*Burgener*, at pp. 517, 520.)  Juror intoxication is "clearly to be discouraged,"

10

as it "threatens both the fairness of the trial and the integrity of the entire judicial process." (*People v. Allen* (1986) 42 Cal.3d 1222, 1265.) However, the same is not true of the decision to take no notes, as such a decision has no direct bearing on the "right to the reasoned, dispassionate and considered judgment of the jury" (*ibid.*). Similarly, in *People v. McNeal* (1979) 90 Cal.App.3d 830, a juror stated she had "personal knowledge" about the case that would have a bearing on the way she would vote (*id.* at p. 835), requiring the court to investigate further having been "alerted to the possibility that a juror cannot properly perform his duty to render an impartial and unbiased verdict" (*id.* at p. 838). Here, in contrast, nothing suggested that Alternate Juror 2 would have been unable to render an impartial and unbiased verdict.

Accordingly, we find no abuse of discretion.

B. *Alleged Venire Contamination*

During voir dire, in a response to a question about whether anyone already knew information about the case, a potential juror stated that he did and that the information was "going to hurt." After a brief exchange in front of the venire, the parties questioned the potential juror in chambers. The trial court then, in the presence of the venire, instructed it to disregard anything the potential juror stated, asked and confirmed that no other potential juror had spoken with him about the additional information, and dismissed the potential juror. Baylon contends that the trial court failed to adequately investigate whether the venire was prejudiced by the potential juror's comments. We disagree.

11

*1. Additional Background*

During voir dire, the trial court asked the venire: "Do any of you know anything about the facts of this case other than what you have learned in this courtroom?" After a potential juror stated that she may have heard something about the case but confirmed that it would not affect her ability to act as a fair and impartial juror, the following extended exchange involving another potential juror ("Martinez") took place:

"[Prospective Juror Martinez]: I came across some material, some photos and some of the defendants.

"[Court]: Okay. Mr. Martinez, you're going to have to talk a little bit more –

"[Prospective Juror Martinez]: I came across—

"[Court]: Let me finish. Talk a little more slowly and clearly to make sure our court reporter can take down everything that is said. So, Mr. Martinez, what have you heard about the –

"[Prospective Juror Martinez]: I heard— No. I've read and I've seen material about the defendants. It's going to hurt. You know how they're saying they're not affiliated with any group or association. These things actually do show that they are affiliated with the groups that they say they're not.

"[Court]: Mr. Martinez, what is it that you have read? Where did you read these—

"[Prospective Juror Martinez]: I read—

12

"[Court]:  Let me finish my question first.  If I understand you correctly, I think you're saying you have read something—

"[Prospective Juror Martinez]:  No.  I've seen photos.

"[Court]:  Okay.  Then you have seen photos— [¶] Let me finish my question.

"[Prospective Juror Martinez]:  Uh-huh.

"[Court]  You have seen photos of these defendants?

"[Prospective Juror Martinez]:  Uh-huh.

"[Court]:  And where do you think you've seen photos of the defendants?

"[Prospective Juror Martinez]:  On the internet.

"[Court]:  On the internet?

"[Prospective Juror Martinez]:  Yeah.

"[Court]:  And like, on Facebook or—

"[Prospective Juror Martinez]:  On Facebook.

"[Court]:  What's that?

"[Prospective Juror Martinez]:  On Facebook.

"[Court]:  On Facebook?

"[Prospective Juror Martinez]:  Yeah.

"[Court]:  And what about—

"[Prospective Juror Martinez]:  Well, it kind of hurts their case.  You know, it shows that they're— you know, how they're not affiliated with— because they're not affiliated with the things they've been doing—

13

"[Court]: Let me ask you this. How did you come across this? Do you have any idea?

"[Prospective Juror Martinez]: Huh?

"[Court]: How did you come across this Facebook—

"[Prospective Juror Martinez]: Just by typing in names.

"[Court]: Recently?

"[Prospective Juror Martinez]: Yeah.

"[Court]: Since we started jury selection?

"[Prospective Juror Martinez]: Um, yeah— or before.

"[Court]: Okay."

The parties then discussed the issue in chambers, outside the presence of the venire. Baylon's counsel moved for a mistrial, stating that prospective juror Martinez "infected the entire panel in that he saw on Facebook where these guys are gang members." Counsel stated that "I think we have to inquire with the other jurors what they heard, too. . . . What it meant to them." Sanchez's counsel disagreed that a mistrial was necessary but asked that the court instruct the venire and see whether Martinez spoke to any other potential jury members about the information he saw. Sanchez's counsel also informed the court that "[p]art of the evidence is Facebook photographs and posts that they've done on Facebook."

The trial court then brought prospective juror Martinez into chambers and asked additional questions. Martinez stated that he saw the case name on a monitor outside of

14

the room and entered Baylon's name into a search engine and into Facebook. He stated that Baylon's Facebook page indicated that he was a member of VIR. When asked whether he had talked to any other prospective jurors about what he saw, Martinez said no. Some moments later, he was asked again, and he re-affirmed that he had not spoken to anybody about what he saw.

In chambers, after prospective juror Martinez left, Baylon's counsel restated that he would move for a mistrial "based upon his poisoning the entire venire," which the trial court denied.

When it returned to the venire panel, the trial court stated: "I want to tell you, all the jurors, not just the jurors up front, but in the audience as well, that all the prospective jurors are instructed to disregard anything that Mr. Martinez discussed during the court's questioning of Mr. Martinez about things that he may have seen or read on the internet. [¶] You can only rely on the evidence that is entered in the courtroom during the course of this trial. It's not appropriate to ever rely on any research or evidence, which is gathered outside of this courtroom." It read the venire an instruction based on CALCRIM No. 101 (Cautionary Admonitions: Jury Conduct). It then stated:

"Two questions. One, I believe, it's my understanding, but I want to double-check this: [¶] Mr. Martinez, I don't believe, has spoken with any other prospective juror about what he talked about during the voir dire questioning. Is that correct? Has any juror talked to him about what he may have seen on the internet? If any juror talked to him about that, please raise your hand now. [¶] And I see no hands.

15

"Next question I'm going to ask is: Has any other juror tried to do any kind of research on the internet or anywhere else related either to this case or the defendants in this case or the criminal gangs or anything like that? If so, please raise your hand now. [¶] Okay. I see no hands." It then thanked and excused potential juror Martinez before concluding for the day.

The next day, when the topic came up in the context of what to instruct other potential jurors, the People stated that a motion for mistrial would not have been proper "because jeopardy has not attached yet," and Baylon's counsel conceded that the motion for mistrial should have been a motion to dismiss the venire.

### 2. *Applicable Law and Discussion*

Baylon does not contest the denial of the motion for mistrial (or motion to dismiss the venire) on appeal. Instead, he contends that the trial court's refusal to investigate further constituted reversible error, claiming that the "very limited inquiry" the trial court did conduct was insufficient. We find no error.

Although this issue bears similarities with Baylon's claim above that the trial court should have investigated Alternate Juror 2's alleged inattentiveness, the applicable law surrounding the two issues are distinct. We have not seen, nor has Baylon directed our attention to, any authority holding that the trial court's investigatory duties with respect to seated jurors are the same as its duties with respect to voir dire.

Instead, "'[t]he Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury.' [Citation.] The [United States Supreme

16

Court] has 'stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias.' [Citations.]  Accordingly, 'the trial court retains great latitude in deciding what questions should be asked on *voir dire*,' and '"content" questions,' even ones that might be helpful, are not constitutionally required.'"" (*People v. Cleveland* (2004) 32 Cal.4th 704, 737 (*Cleveland*).)

"To be an abuse of discretion, the trial court's failure to ask questions 'must render the defendant's trial fundamentally unfair.' [Citation.]  'Such discretion is abused "if the questioning is not reasonably sufficient to test the jury for bias or partiality."'" (*People v. Cleveland*, *supra*, 32 Cal.4th at p. 737; see also *People v. Medina* (1990) 51 Cal.3d 870, 889 [although "further investigation and more probing voir dire examination may be called for" when prospective jurors make inflammatory remarks, trial court possesses "broad discretion" to determine if venire should be discharged due to contamination].)

Prospective juror Martinez revealed only that photos he had seen of Baylon indicated to him that Baylon had been "affiliated" with a "group" Baylon denied being a part of.  Martinez did not state, and would likely not have been able to discern, whether the photos he saw showed that Baylon was a *member* of a gang or whether he had some more tenuous connection to it.  Further, nothing in Martinez's statements in front of the venire indicated that Baylon either currently remained "affiliated" or was at any specific point in time.  Because of this, Martinez's additional statement that what he saw was "going to hurt" Baylon was speculative.

17

Based on the vagueness of prospective juror Martinez's statements, the trial court's question to the venire about whether anyone had talked with him about what he had seen was reasonably sufficient to test for the jury's bias or impartiality. (*People v. Cleveland*, *supra*, 32 Cal.4th at p. 737.) The question reasonably presumed that Martinez's comments were not inherently prejudicial, and by asking it, the trial court was able to determine that no further investigation was necessary. The facts here are unlike *Mach v. Stewart* (9th Cir. 1998) 137 F.3d 630, where the federal Ninth Circuit found in a child sex abuse case that a potential juror's statements were "intrinsically prejudicial." (*Id.* at p. 633.) In that case, the potential juror stated that she had "worked with children as a social worker for the state for at least three years" and that she "had *never* been involved in a case in which a child accused an adult of sexual abuse where that child's statements had not been borne out." (*Id.* at p. 633; see also *id.* at p. 634 ["The result of the trial in this case was principally dependent on whether the jury chose to believe the child or the defendant"].) In contrast, what Martinez claimed to have seen was not a central issue at trial and did not directly bear on Baylon's guilt or innocence. (Baylon's attorney went so far as to admit during closing arguments that Baylon "has been a gang banger since he was a kid.") We find no abuse of discretion here.

C. *Section 654*

Baylon next contends that the trial court violated section 654's prohibition against multiple punishments for the same course of conduct. Specifically, he contends that section 654 required the court to stay the punishments imposed for the robbery and

18

burglary counts, the gang enhancements on the assault and burglary counts, and the section 12022.5, subdivision (a) enhancement on count 4. We disagree.

Under former section 654, which was applicable at the time Baylon was sentenced, "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Although the statute has since been revised such that imposition of the longest potential term is no longer required, that change is not relevant here. Our analysis focuses on whether section 654 applies in the first instance.)

This restriction applies not only to a single act violating multiple code provisions, but also to an indivisible """"course of conduct"""" violating several statutes. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1207-1209.) Whether a course of conduct is divisible for purposes of section 654 depends on the intent and objective of the defendant. (*People v. Latimer*, *supra*, 5 Cal.4th 1203 at pp. 1207-1209.) If multiple offenses "'were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'" (*People v. Correa* (2012) 54 Cal.4th 331, 336.) Additionally, "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment." (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11.) And when, as here, a trial court sentences a defendant on multiple counts, a finding that section 654 does not apply is a "factual determination that must be sustained on appeal if supported by substantial evidence." (*People v. Osband* (1996) 13 Cal.4th 622, 730.)

At sentencing, the trial court stayed various punishments under section 654. Baylon contends that section 654 additionally applied to the punishments he now identifies because "the record and the arguments of the prosecutor establish that [Baylon and Sanchez] were motivated by the single objective of 'gang politics.'" However, substantial evidence supports the trial court's finding that imposing separate punishments was proper. (See *People v. Akins* (1997) 56 Cal.App.4th 331, 339 [rejecting claim that defendant's sole objective was "to benefit his gang" based on substantial evidence].)

Aguirre was the victim of both the attempted murder and robbery counts, but section 654 did not bar punishment for the robbery because it was pursued with a different criminal objective. (See *People v. Pearson* (2012) 53 Cal.4th 306, 334 ["The robbery and sexual assaults were pursued with different criminal objectives than the murder and could be separately punished"].) Additionally, although burglary is not necessarily a crime of violence, it may be "when the defendant personally used a firearm in committing the offense," and "section 654 does not prohibit multiple punishments where the defendant's single objective during an indivisible course of conduct results in crimes of violence against multiple victims." (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 230.) Here, substantial evidence supports an implied finding that Cynthia Cedeno and Deanna Garcia, who were living in the house at the time, were the victims of the burglary. Cedeno testified that, during the incident, someone took her and Garcia's cell phones. From this, the trial court could have found that the burglary fell under the multiple victim exception, even though there were no findings of fact that

20

Cedeno and Garcia were the burglary victims.  (See *id.* at p. 232 [trial court may "properly find the burglary was committed against multiple victims, even though the identities of the victims were not alleged in the information or found by the jury"].)

Finally, because the conduct giving rise to each of the substantive offenses is divisible, section 654 does not require any enhancements to those offenses be stayed. (*People v. Wooten* (2013) 214 Cal.App.4th 121, 131.)  Substantial evidence supported the trial court's application of section 654 here.

### D.  Assembly Bill 333

After briefing had concluded in this matter, the Legislature enacted Assembly Bill 333 and Senate Bill 567.  We allowed supplemental briefs addressing the new laws.

Section 186.22 enhances the punishment of a person convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1), (4).)  Assembly Bill 333 narrowed the definition of "criminal street gang."  What used to be defined in part as "any ongoing organization, association, or group of three or more persons . . . whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity" (former § 186.22, subd. (f)) is now defined in part as "an ongoing, *organized* association or group of three or more persons . . . whose members collectively engage in, or have engaged in, a pattern of criminal gang activity" (§ 186.22, subd. (f), italics added).  Assembly Bill 333 also raised the bar for proving a "pattern of criminal gang

21

activity," which is needed to establish a criminal street gang, in various ways. Relevant here is that predicate offenses must now be proven to have "commonly benefitted a criminal street gang, and the common benefit of the offense[s] is more than reputational." (Assem. Bill 333, § 3, revised § 186.22, subd. (e)(1).)

These changes to the law brought by Assembly Bill 333 apply retroactively to Baylon; his judgment will not be final when the amendments take effect, and there is no disagreement among the parties whether this portion of Assembly Bill 333 is retroactive. (See *People v. Lopez* (2021) 73 Cal.App.5th 327, 344.)

Baylon may also be able to benefit from these changes. Baylon contends that there is no evidence in the record to show that the common benefit of VIR's predicate offenses was "more than reputational." The People observe in response that an expert witness testified that gangs *in general* can commit crimes for non-reputational reasons, such as to earn money, but that is not the same as evidence showing that VIR committed the predicate offenses for non-reputational reasons.

Accordingly, we reverse the gang enhancement findings and remand to give the prosecution an opportunity to retry them under the new standards.

*E. Senate Bill 567*

When Baylon was sentenced, the trial court had broad discretion under section 1170 to decide whether to impose the lower, middle, or upper term of imprisonment for an offense. (See former § 1170, subd. (b); *People v. Whitmore* (2022) 80 Cal.App.5th 116, 131 (*Whitmore*).)

"Senate Bill 567 amended section 1170 in several respects.  Relevant here is the fact that section 1170, subdivision (b), now makes the middle term the presumptive sentence unless certain circumstances exist, such as if 'there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial.'  (§ 1170, subd. (b)(2).)"  (*Whitmore*, *supra*, at p. 131.)  However, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."  (§ 1170, subd. (b)(3).)

The People concede, and we agree, that the changes to section 1170, subdivision (b) apply retroactively to Baylon.  (See also *Whitmore*, *supra*, at p. 131.)

At sentencing, the trial court imposed the upper terms for the robbery count and each of the section 12022.5, subdivision (a) enhancements (which the court then stayed under section 654 as to counts 1 and 2).

In imposing the upper terms, the trial court relied on numerous factors that, absent a finding by the trier of fact, a stipulation, or a certified record of conviction, are no longer permitted to be considered under section 1170, subdivision (b).  For example, the trial court relied on determinations that the crimes involved great bodily harm, that the victim was particularly vulnerable, that the crimes involved planning and sophistication, that Baylon took advantage of a position of trust, that Baylon has engaged in violent conduct that indicates a serious danger to society, and that Baylon's prior performance on

23

probation or parole was unsatisfactory.  (See Cal. Rules of Court, rule 4.421(a)(1), (a)(3), (a)(8), (a)(11), (b)(1), (b)(5).)  None of these factual determinations were made by the jury, however, and we cannot conclude that the jury would unquestionably have found those facts to be true.  (See *Whitmore*, *supra*, at pp. 131-132; *People v. Sandoval* (2007) 41 Cal.4th 825, 839 ["if a reviewing court concludes, beyond a reasonable doubt, that the jury, applying a beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless"].)  A "reviewing court cannot always be confident that the factual record would have been the same had aggravating circumstances been charged and tried to the jury." (*People v. Sandoval*, *supra*, at p. 840.)

Additionally, the trial court relied on determinations that Baylon's prior convictions are numerous or of increasing seriousness and that he has served a prior term in prison.  (See Cal. Rules of Court, rule 4.421(b)(2), (b)(3).)  Although section 1170, subdivision (b) allows the trial court to "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury" (§ 1170, subd. (b)(3)), there is no indication that the trial court was presented with certified records of conviction or that Baylon admitted prior convictions.[6]

---

[6] The jury heard testimony that Baylon was once arrested for carrying a shotgun. Other documents in the record suggest that Baylon was ultimately convicted for carrying a concealed firearm (§ 25400, subd. (a)(2)), although it is not clear whether anything showing Baylon's conviction was ever entered into evidence.  The testimony was offered to show that VIR had engaged in a "pattern of criminal gang activity" as the term is

*[footnote continued on next page]*

The trial court also relied on factors not permitted even before Senate Bill 567, such as the fact that Baylon was armed with or used a weapon at the time of the commission of the crimes. (See Cal. Rules of Court, rule 4.421(a)(2); former § 1170, subd. (b) ["the court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law"].) Here, the upper term was imposed on the robbery count, but the sentence on the robbery count included a firearm enhancement as well, and the court could not properly impose upper terms on the firearm enhancements based only on the fact he was armed.

Accordingly, because we cannot find that any error here would have been harmless, we vacate Baylon's sentence to allow for resentencing under the law as amended by Senate Bill 567.

## III. DISPOSITION

The findings on the gang enhancements are reversed and the sentence is vacated. The matter is remanded for the trial court to (1) provide the prosecution an opportunity to retry the gang enhancements under the law as amended by Assembly Bill 333; (2) provide the prosecution an opportunity to seek an upper term sentence on count 2 or the section 12022.5, subdivision (a) enhancements (or both); and (3) at the conclusion of any retrial of the gang enhancements, or on remand if the prosecution elects not to conduct

defined in section 186.22, subdivision (e)(1), but the jury could have found such a pattern merely by concluding that Baylon committed a crime without necessarily being convicted of it. (See § 186.22, subd. (e)(1) ["pattern of criminal gang activity" includes "commission of . . . or conviction of" certain offenses].) Under these circumstances, we are unconvinced that the upper terms imposed by the trial court were supported by jury findings of Baylon's previous criminal activity.

25

such a retrial, resentence Baylon. At resentencing, the trial court may also consider any other new sentencing laws that apply to Baylon, as his judgment is not yet final. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL

J.

We concur:

MILLER

Acting P. J.

SLOUGH

J.